**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 23 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENInTH CIRCUIT

---

DOMINGO ARAGON; EVA ARAGON; LEWIS
AUDET; ANNE AUDET; VIRGINIA BARTLETT;
BOB C. BECK; INEZ BECK; BILLY BROWN;
CHRISTA BROWN; CLEMENTE CABRIOLES;
MANUEL CERECERES; ROSEMARY DEAN; EVA
GOMEZ; ETHEL LOGAN; CAREY LOGAN;
BENITO MARTINEZ; EPIFANIA MARTINEZ;
M.C. MCDONALD; SHIRLEY MCDONALD; TOM
MAGGART, JR.; STEVE OLDFIELD; TAMMY
OLDFIELD; G.R. PARTIN; MOLLY PARTIN;
RICHARD PRESCOTT; ROY PRESCOTT; FRANK
RHYMES; RITA RHYMES; FERN ROWDEN;
DARRYL SAMPLES; MARY SAMPLES;
ROSALINDA SOSA; JOE TORRES; DESTRY
TUCKER; DANA TUCKER,

     Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA,

     Defendant-Appellee.

No. 97-2047

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-94-592-JP)

---

Richard A. Blenden (Daniel R. Dolan and Pete V. Domenici, Jr. of Dolan &

Domenici, Albuquerque, New Mexico, with him on the brief) of Blenden Law Firm, Carlsbad, New Mexico, for Plaintiff-Appellants.

S. Michael Scadron (Frank W. Hunger, Assistant Attorney General; John J. Kelly, United States Attorney; John Zavitz, Assistant United States Attorney; and J. Patrick Glynn, Joann J. Bordeaux, David S. Fishback, and J. Charles Kruse of the Department of Justice with him on the brief) of the Department of Justice, Washington, D.C., for Defendant-Appellee.

---

Before **TACHA, BRORBY**, and **BRISCOE**, Circuit Judges.

---

**BRORBY**, Circuit Judge.

---

The plaintiffs-appellants, Mr. Domingo Aragon and other landowners residing southeast of the former Walker Air Force Base ("Plaintiffs"), filed a tort action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680, alleging negligence and negligence per se relating to the contamination of their residential water wells.[1]  The Government answered the complaint and filed a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), claiming the discretionary function exception to the Tort Claims Act, 28 U.S.C. § 2680(a), barred the action.  After a four-day bench trial focusing on the discretionary function exception, the district court dismissed the case for lack of

---

[1]  The Plaintiffs' action also included civil rights claims for "deprivation of property, inverse condemnation, and appropriation without due process and without compensation."  The parties do not address these claims on appeal.

subject matter jurisdiction.[2]  The Plaintiffs appeal the district court's dismissal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.  Background

In 1942, the military established an airbase on the outskirts of Roswell, New Mexico, to train Army Air Corps pilots for World War II.  In 1949, the base was redesignated Walker Air Force Base (the "Base"), and became a Strategic Air Command Post.  The Base was used by the United States Air Force during the Korean Conflict for flying and supporting reconnaissance missions.  The Base also was prepared to assist Strategic Air Command war planes bombard strategic targets in the event of war.  In the 1960s, the Base's mission expanded to support United States military efforts in Vietnam.

Throughout this time, the military washed aircraft and aircraft engines with trichloroethylene ("TCE"), on or near Base runways.  TCE is a toxic organic solvent, known to be used by the military as a degreasing agent.  At least every other day a squadron of fourteen aircraft were washed on "ready-alert" pads

---

[2]  This bench trial was held pursuant to the district court's bifurcation and scheduling order dated October 6, 1995.  The district court bifurcated damage issues from this trial, which focused solely on the discretionary function exception and related liability issues.

located near the runways. These planes were used for special missions designed to gather information on how close aircraft could fly over a nuclear detonation without being contaminated. The planes were washed immediately after returning from their missions to remove radioactive debris and dust. The resulting TCE-contaminated waste water flowed into ditches and unlined detention basins located near the Base's east boundary.[4]

In 1967, the government deactivated the Base, and in 1968, deeded most of the site to the City of Roswell. In 1991, the New Mexico Environmental Department detected TCE in the Plaintiffs' wells located near the Base's east boundary. The Army Corp of Engineers subsequently identified the probable source of contamination as the Base site.

In August 1993, the Plaintiffs filed claims with the Air Force for compensation, which were subsequently rejected. The Plaintiffs then filed this action against the United States under the Federal Tort Claims Act, requesting damages for personal injuries, emotional distress, diminution in property values, and other related compensation. The Plaintiffs countered the Government's

---

[4] Plaintiffs identified other possible sources of TCE contamination within the Base. Our analysis, however, is unaffected by the precise number or location of TCE sources.

motion to dismiss by claiming Air Force manuals, regulations, and New Mexico state law imposed a mandatory, nondiscretionary duty on the Air force to consider the effects of waste water disposal on groundwater and to dispose of its waste water so as to avoid groundwater pollution. In addition, the Plaintiffs claimed the decisions on how to dispose of TCE are not the type of policy decisions the discretionary function exception was designed to protect. The district court rejected the Plaintiff's contentions and dismissed their complaint. The Plaintiffs appeal, relying on essentially the same arguments they presented to the district court.

## II. Analysis

The Federal Tort Claims Act waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their employment. 28 U.S.C. §1346(b)(1). The United States can be held liable "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674. Excluded from the Tort Claims Act's broad waiver of immunity are claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" by a federal agency or a federal governmental employee. *Id.* § 2680(a). This exception "marks the boundary

between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The exception applies even if the governmental employees were negligent. *Allen v. United States*, 816 F.2d 1417, 1421 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988).

The discretionary function exception "'poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction.'" *Miller v. United States*, 710 F.2d 656, 662 (10th Cir.) (quoting *Baird v. United States*, 653 F.2d 437, 440 (10th Cir. 1981), *cert. denied*, 454 U.S. 1144 (1982)), *cert. denied*, 464 U.S. 939 (1983). We review *de novo* whether this exception applies to the undisputed facts in this case. *Duke v. Department of Agric.*, 131 F.3d 1407, 1409 (10th Cir. 1997).

In determining whether the discretionary function exception applies to the challenged conduct, we use the two-pronged analysis provided by the United States Supreme Court in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). *Duke*, 131 F.3d at 1409. Since the exception covers only those acts "involv[ing] an element of judgment or choice," we must first determine if "a federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. This Court requires the prescribed course of conduct be specific and mandatory. *See, e.g., Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540 (10th Cir. 1992) (ruling general health and safety policies underlying CERCLA response actions provided discretion because they were not couched in terms of specific and mandatory directives); *Allen*, 816 F.2d at 1421 (concluding the Atomic Energy Commission's general statutory duty to consider public health and safety when conducting open air atomic bomb tests was broad and discretionary). If a federal statute, regulation or policy imposes specific, mandatory directives, conduct pursuant to those directives is not discretionary since "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. However, if the employee's conduct involves "a matter of choice" or judgment, then the action is discretionary, and we proceed to the second prong of our analysis. *Id.*

Under the second prong of the *Berkovitz* test, we must determine whether the exercise of judgment or choice at issue "is of the kind that the discretionary function exception was designed to shield." *Id.* "[O]nly governmental actions and decisions based on considerations of public policy" are protected by the exception. *Id.* at 537. This limitation is consistent with "Congress' [desire] to

'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* (quoting *Varig*, 467 U.S. at 814).

## A.  Discretionary Conduct

We now apply *Berkovitz* to the present facts.  The Plaintiffs contend the Air Force violated specific, mandatory requirements to cooperate with state and local officials to prevent water pollution, and to dispose of TCE in such a manner to avoid polluting groundwater, as set forth in Executive Order 10014, Air Force Manuals 85-14 (Maintenance and Operation of Sewage and Industrial Plants and Systems (1959)) and 88-11 (Sewage, Refuse and Industrial Waste) (1956)), Air Force Regulation 91-9 (Utilities Operation and Services: Sewage and Industrial Waste Works (1950, 1953, 1958, 1965)), and New Mexico state law.[5] Accordingly, the Plaintiffs maintain the government's conduct was not within the discretionary function exception.  We review each document in turn to determine

---

[5]  The Plaintiffs urge this court to rely on *Clark v. United States*, 660 F. Supp. 1164 (W.D. Wash. 1978), *aff'd*, 856 F.2d 1433 (9th Cir. 1988), to rule the Air Force was required by its manuals to consider the effect of ground water in disposing its industrial waste.  However, we decline for the principal reasons that *Clark* (1) is factually distinguishable and involved legal provisions and Washington state law not applicable in the present case, and (2) having been decided prior to *Berkovitz*, the analysis in *Clark* strays significantly from presently accepted discretionary function analysis.  *Clark* simply has no precedential value in this circuit.

whether, indeed, any of the documents prescribed a specific, mandatory course of conduct regarding the disposal of waste water from aircraft washdown operations at the Base.

*Executive Order 10014*

Executive Order 10014 directed

heads of the departments, agencies, and independent establishments of the executive branch ... to take such action *as may be practicable*, in cooperation with State and local authorities ... to insure the disposal of sewage, garbage, refuse, and other wastes accumulated in the course or as a result of Federal activities ... in such manner as will conform with programs formulated under State law....

Exec. Order No. 10014, 13 Fed. Reg. 6601 (1948) (emphasis added). Although the Plaintiffs concede Order 10014 gave discretion to the Air Force as to which method it chose to dispose of its waste water, the Plaintiffs suggest Order 10014 did not permit the Air Force to do nothing and to pollute the groundwater. In other words, the Plaintiffs contend Order 10014 did not permit the Air Force simply to run its TCE-contaminated waste water into an open ditch.

By its express language, Executive Order 10014 required the Air Force to take action only as "practicable." Exec. Order No. 10014, 13 Fed. Reg. 6601 (1948). "[A]s may be practicable" is a prime example of discretionary language, which gave federal agencies a choice or judgment on what action to take, *if any*.

It is clear the Order promoted a policy of cooperation with state and local water authorities; however, the Order alone contained no specific, mandatory directives for the Air Force to follow in disposing its waste water from aircraft washdown operations. *See Daigle*, 972 F.2d at 1540; *Allen*, 816 F.2d at 1421. Moreover, with respect to the Plaintiffs' argument that Order 10014 did not permit the Air Force to simply do nothing, the record fails to support the Plaintiffs' suggestion the Air Force never considered the impact of its method for disposing the TCE-contaminated waste water on groundwater pollution. Thus, the Plaintiffs cannot rely on Order 10014 to establish jurisdiction under the Federal Tort Claims Act.

*Air Force Manual 85-14*

The Plaintiffs next contend federal standards in effect when Order 10014 applied determined what methods of disposal were "practicable," and therefore prescribed standards for the Air Force to follow to avoid groundwater pollution. The Plaintiffs rely, in part, on Air Force Manual 85-14 (1959) to support their contention the Air Force had identified "practicable" methods to dispose of its toxic wastes, which could not be ignored pursuant to Order 10014. They refer to § E1.02, which states "[t]he installations engineer, in accordance with AFR 91-9, will supervise the treatment and disposition of industrial wastes, which will be accomplished in a manner meeting anti-pollution requirements established by

-10-

State control agencies." AFM 85-14 § E1.02. They also refer to § E1.03b, which states the "[d]ischarge of [industrial waste] must be stringently controlled." In addition, the Plaintiffs refer to § E1.04d, which states wastes produced in the "cleaning of aircraft ... pollute potable water." *Id.* § E1.04d. Lastly, they refer to § E2.01a, which states "[o]pen carrier ditches and canals must not be used for the collection of industrial wastes involving fire or explosion hazards or odor nuisance." *Id.* § E2.01a. The Plaintiffs suggest a "fair reading" of these provisions imposes a specific, mandatory duty on the Air Force to handle TCE in a reasonable manner, which prohibits running it into an unlined ditch and pit.

We first address the Manual generally, and then evaluate the particular sections the Plaintiffs cite. An agency manual, in contrast to a regulation, is not necessarily entitled to the force and effect of law. *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) (per curiam) (ruling a Social Security Claims Manual not binding on the government). This is particularly true if the agency did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document. *See Hamlet v. United States*, 63 F.3d 1097, 1103-05 (D.C. Cir. 1995) (holding agency personnel manual not binding if, among other factors, the agency did not intend for it to be binding). Air Force Manual 85-14 specifically states it is "intended for guidance" and "[b]ecause of the varied nature of industrial

-11-

problems, principles rather than practices are emphasized." AFM 85-14, § E1.01 (Purpose and Scope). This express qualification weighs heavily against ruling the Manual prescribed mandatory directives for the Air Force to follow.

Furthermore, we find no specific, mandatory directives in the particular sections cited by the Plaintiffs. Consistent with the Manual's purpose and scope, those sections provide Air Force personnel discretion in their decisions on how to dispose of TCE. For example, under § E1.02, the installation engineer's supervision of industrial waste disposal is governed by Air Force Regulation 91-9 (1953). AFM 85-14, § E1.02. Air Force Regulation 91-9 requires installation commanders to cooperate with civil authorities on state stream abatement programs to prevent water pollution and to comply with state water contamination standards. AFR 91-9, § 8 (1958). At the outset, we question whether this regulation applied to the challenged conduct at all since it pertained to state stream abatement programs, not to isolated ditches and groundwater.

Nevertheless, we fail to find any support in the record that the installation commander did not cooperate with state officials. In addition, the Plaintiffs fail to bring to our attention any New Mexico water quality standards in effect during the Base operations, and which provided specific, mandatory directives pertaining

to TCE disposal.

The Plaintiffs do refer to a New Mexico public nuisance statute in effect during the Base's operations, which prohibited the knowing and unlawful introduction of any substance into a public water body causing the water to be dangerous for human consumption. N.M. Stat. Ann. § 40A-8-2 (1953) (recodified as N.M. Stat. Ann. § 30-8-2 (1978)). We cannot equate this broad public nuisance statute to specific, mandatory water quality standards. In addition, the Plaintiffs cite no evidence in the record indicating the Air Force "knowingly and unlawfully" introduced TCE into a public water body. The Air Force disposed of TCE-contaminated waste water in isolated unlined ditches or basins. Although the Army Corps of Engineers opine TCE ultimately seeped into the underground aquifer, which constitutes a body of public water under the statute, N.M. Stat. Ann. § 30-8-2 (1978), the record does not support the Plaintiffs' contention the Air Force acted "knowingly and unlawfully." Finally, and most important, even if state standards had existed, or the nuisance statute somehow created a standard, existing Air Force Regulation 91-9 expressly provided Air Force personnel with discretion to resolve any conflict in favor of Air Force policy.

Returning our attention to Air Force Manual 85-14, § E1.03 states the

discharge of toxic wastes must be "stringently controlled." AFM 85-14 § E1.03. Section E1.04d. acknowledges that solvents used in cleaning aircraft pollute potable water. *Id.* § E.01d. However, these sections do not prescribe specific, mandatory waste water disposal methods or treatment procedures.[6] With regard to the aircraft washdown operations at issue, the Manual states "[t]he only treatment *ordinarily* required for aircraft wash water wastes is to remove free oils and greases." *Id.* § 4.04. The treatment and disposal of organic solvents is not even mentioned.

Lastly, we consider § E2.01a, which prohibits the use of open carrier ditches to collect industrial wastes involving fire or explosive hazards, or odor nuisance. *Id.* § E2.01a. The record indicates TCE generally does not involve fire or explosive hazards. The Plaintiffs provided no evidence TCE involves an odor nuisance. Based on the record, we fail to see how this section in any way specifically directed the disposal of the aircraft waste water at issue.

---

[6] Instead, the Manual clearly states "wastes are as varied as industrial and commercial operations themselves, and therefore treatment for each type of waste must be considered individually." AFM 85-14 § E1.04. Likewise, § E3.03 specifically provides "[t]here is no standard method for treating industrial wastes," recognizing the differences between industrial sites. *Id.* § E.3.03.

We therefore find nothing in Air Force Manual 85-14 that usurps Air Force personnel discretion to determine how to dispose of TCE-contaminated waste water.

*Air Force Manual 88-11*

The Plaintiffs also rely on Air Force Manual 88-11 (1956) to support their contention the Air Force had a nondiscretionary duty to dispose of its wastewater so as to avoid groundwater contamination. Similar to Manual 85-14, Manual 88-11 emphasizes principles rather than practices "[b]ecause of the varied nature of industrial waste problems." The Plaintiffs, however, suggest Manual 88-11 requires the Air Force to do whatever may be necessary to protect water resources from pollution damage under all circumstances. The Manual imposes no such requirement. Instead, the Manual articulates that the protection of water resources is the objective of industrial waste disposal. An objective, alone, does not equate to a specific, mandatory directive. In addition, the Plaintiffs have provided no evidence the Air Force did not consider this objective in its aircraft washdown operations.

Furthermore, in working towards its objective, the Manual recognizes "[t]here is no standard method for treating industrial wastes" due to the

complexity and diversity of industrial wastes. AFM 88-11 § 6-17. Accordingly, the Manual does not prescribe specific, mandatory conduct. To the extent the Manual identifies pollution control practices, it uses suggestive, rather than mandatory language. For example, it suggests "[i]ndustrial waste disposal *should be* discussed with the state water pollution control agencies." AFM 88-11, § 6-05 (emphasis added). The Manual further provides, "[i]nformation *should* be furnished to the state indicating *insofar as practicable* the characteristics and qualities of industrial wastes to be handled." *Id.* (emphasis added). Most important, the Manual expressly acknowledges "[t]he exigencies of military operations and security may preclude strict adherence to all of these recommendations relative to cooperation with the state pollution control authority." *Id.* § 6-05(c). Manual 88-11 thus left much discretion to those implementing its recommendations.

In summary, not one of the sources cited by the Plaintiffs provided specific, mandatory directives for the Air Force's disposal of waste water from the aircraft washdown operations. Therefore, the Air Force's decision on how it disposed of its waste water from the washdown operations was discretionary.

## B. Public Policy Considerations

Having concluded the Air Force had discretion regarding its handling and disposal of wastewater from its aircraft washdown operations, we proceed to the second prong of the *Berkovitz* analysis and ask whether that activity was "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Only decisions and actions "based on considerations of public policy" are protected from liability. *Id.* at 537.

The Plaintiffs contend our evaluation of the Air Force's conduct should focus on groundwater protection policies, not the broader policies affecting airbase operations. Therefore, the Plaintiffs claim since the Air Force did nothing to contain TCE used in aircraft washdown operations, its actions were not based on considerations of relevant public policy.

We fully agree with the district court on this issue. We have "little doubt ... the Air Force's actions involved policy choices of the most basic kind." The Base operated under military exigencies during World War II, the Korean Conflict, the Vietnam Conflict, and the Cold War. Operational decisions during this twenty-five year active period undoubtedly were subject to defense and security considerations which encompass the heart of military policy. Indeed, the record makes clear the military recognized it needed flexibility to weigh its

groundwater protection policies against broader public and military policies; thus it allowed the Air Force to place security and military concerns above any other concerns. *See, e.g.*, AFM 88-11, § 6-05c. (stating "[t]he exigencies of military operations and security may preclude strict adherence to ... recommendations relative to cooperation with the state pollution control authority."

We also recognize "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *United States v. Gaubert*, 499 U.S. 315, 324 (1991). Therefore, to survive a motion to dismiss, the Plaintiffs must have alleged facts which support the finding the government's actions were not grounded in policy. *Id.* at 324-25. We focus "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325. Accordingly, we need not determine what specific factors led Air Force personnel to dispose of the TCE-contaminated waste water as it did. The record before us sufficiently demonstrates that Base operational decisions, including industrial waste disposal decisions, were subject to public policy analysis due to the military exigencies at the time. Plaintiffs fail to

provide proof to the contrary. We therefore conclude the Air Force's disposal of TCE-contaminated waste water at Walker Air Force Base was the kind of activity the discretionary function is designed to shield. Hence, the discretionary function applies, and we **AFFIRM** the dismissal of this case.