**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

NANCY ELDER and JEFFREY D.
EGGERTZ,

    Plaintiffs - Appellants,

  v.

UNITED STATES OF AMERICA,

    Defendant - Appellee.

No. 01-4120

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:99-CV-241-K)**

---

Kathryn Collard of the Law Firm of Kathryn Collard LC, Salt Lake City, Utah, for
Plaintiffs-Appellants.

Jeffrey E. Nelson, Assistant United States Attorney (Paul M. Warner,
United States Attorney, Carlie Christensen, Assistant United States Attorney,
Salt Lake City, Utah, and G. Kevin Jones, Office of the Solicitor, United States
Department of the Interior, of counsel, with him on the brief), for Defendant-
Appellee.

---

Before **HARTZ** , **ALDISERT** ,<sup>*</sup> and **PORFILIO** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

  <sup>*</sup>The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for
the Third Circuit, sitting by designation.

Plaintiffs Nancy Elder and Jeffrey D. Eggertz appeal from the district court's order granting summary judgment in favor of Defendant, the United States of America. Plaintiffs brought this action under the Federal Tort Claims Act (FTCA), 28 U.S.C §§ 1346(b) and 2671-2680, for the wrongful death of their 12-year-old son, Tyler Eggertz, who died when he slipped and fell over a ledge while crossing a stream at the Middle Emerald Pools at Zion National Park (Zion).

Plaintiffs allege that Zion employees were negligent in failing to protect visitors, by warnings or otherwise, from the danger of falling at the Middle Emerald Pools. The district court ruled that liability was foreclosed by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

I.      **BACKGROUND**

The horrific accident at issue in this case occurred on March 28, 1997. Tyler Eggertz died while attempting to cross a small stream at the Middle Emerald Pools at Zion National Park. As he stepped into the stream, he slipped on slick algae growing on the streambed and fell down. Unable to rise, Tyler slid downstream approximately 15 feet, fell over a ledge, and plunged more than 100 feet onto rocks below.

The Emerald Pools is one of Zion's most-visited attractions, drawing approximately one-third of the park's more than two million annual visitors. The

-2-

Emerald Pools attraction has three levels: the Lower, Middle, and Upper Emerald Pools. The Middle Emerald Pools is a smooth, relatively flat sandstone plateau that slopes downward toward an overhanging ledge. Two shallow, narrow streams flow over the plateau, down the sandstone surface, and off the plateau ledge, creating waterfalls which cascade onto rocks near the Lower Emerald Pools, more than 100 feet below. The stream that Tyler attempted to cross was less than four feet wide and only three to five inches deep. (A photograph of the Middle Emerald Pools as it appeared shortly after Tyler's death is attached as an appendix to this opinion.)

Prior to his fall, Tyler had been hiking with his family along the Emerald Pools trail, a popular trail leading to the three Emerald Pools. This trail begins just across the road from the main lodge at Zion. Near the Lower Emerald Pools, the trail splits into two branches which initially head in opposite directions. Both branches ascend toward the Middle Emerald Pools. The trail then continues higher to the Upper Emerald Pools.

At the Lower Emerald Pools, Tyler, his 15-year-old sister, and his 14-year-old cousin hiked ahead of their family, and proceeded up the right branch of the trail toward the Middle Emerald Pools. Along the trail to the Middle Emerald Pools, there were at least 14 signs that warned of various hazards and cautioned visitors to stay on the trail. Four signs read, "All three Emerald Pools and

connecting creeks are closed to swimming, bathing and wading." Four other signs warned: "Stay on trail. Caution. Near the edge footing can be dangerous." Two signs read "Danger - Cliff. Slippery Sandstone. Unstable Rock Edge. Wet Rock Hazardous." Four signs indicated the path and direction of the trail. And off the trail, embedded in the sandstone near where Tyler tried to cross the stream, five signs read, "Danger beyond this point," although Plaintiffs dispute that Tyler was close enough to the ledge to see these particular signs at the time of the accident.

No signs specifically mentioned the danger of algae in the streams. Also, as the trail enters the sandstone plateau of the Middle Emerald Pools, no barriers or guardrails prevented visitors from leaving the trail and walking toward the ledge.

When the children reached the Middle Emerald Pools, they left the trail and sat on the sandstone plateau by one of the streams, approximately 15 feet from the ledge. It was near here that Tyler attempted to cross the stream, slipped on the algae growing on the sandstone streambed, and fell to his death.

Tyler's death was not the first at the Middle Emerald Pools. In 1968, 1983, and 1984, three other individuals had fallen to their deaths from the same area where Tyler died. A fourth person may also have died at the Middle Emerald Pools in 1972. Tyler's accident was nearly identical to the accidents that

occurred in 1983 and 1984; in each case an individual slipped on algae while crossing a stream, and perished after sliding over the ledge onto the rocks below.

After each fatality at the Middle Emerald Pools, Zion's superintendent convened a board of inquiry to evaluate the circumstances of the accident and recommend potential safety improvements. The 1983 inquiry led Zion employees to add and change certain warning signs near the site of the accident. The 1984 inquiry induced discussions about a number of possible safety improvements at the Middle Emerald Pools, including augmenting existing warning signs to indicate that individuals had died in the area, and placing boulders along the trail edge to better delineate the trail across the sandstone. But apparently Zion officials did not implement any of these suggestions prior to Tyler's death.

In 1995 the safety committee undertook an analysis of safety issues relating to the Emerald Pools trail. The committee discussed whether signage at the Middle Emerald Pools was adequate, and considered the feasibility of installing a device, such as a cable "grab bar" or net, that could prevent a visitor who slipped in the stream from falling over the ledge. In addition, the committee considered whether "additional accident prevention work is needed" at the Emerald Pools area and identified two "action items": (1) "Reposition a few of the signs to more visible areas," and (2) "Consider natural barricades in some areas." The record

does not reflect whether any of these suggestions was implemented prior to Tyler's death.

Following Tyler's death, Zion officials modified the signage along the Emerald Pools trail. For example, at the beginning of the Emerald Pools trail, Zion officials added a sign reading, "Please: watch your children– there are steep drop-offs. Swimming or wading in the pools is prohibited." In addition, Zion officials removed two of the "Danger beyond this point"signs that were embedded in the sandstone plateau of the Middle Emerald Pools, and installed a rope chain near the Middle Emerald Pools to better define the path of the trail in that area. Although unclear from the record, it is also possible that additional signs indicating the path and direction of the trail to the Middle Emerald Pools were installed, and that two of the signs prohibiting "swimming, bathing, and wading" in the Emerald Pools were moved to different locations on the trail.

## II.    ANALYSIS

The FTCA waives the federal government's sovereign immunity for "the negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Plaintiffs allege that the government was negligent in (1) failing to warn of the algae hazard at the Middle Emerald Pools and (2) failing to provide adequate barriers, equipment, or

-6-

supervision to prevent visitors from falling over the ledge at the Middle Emerald Pools.

To prevail, however, Plaintiffs must prove more than negligence. They must also first prove that their claims are not based upon actions immunized from liability under the FTCA's discretionary function exception, 28 U.S.C. § 2680(a). *See Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) ("The discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction.") (internal quotation marks omitted). This exception excludes from the FTCA's waiver of immunity those claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" by a federal agency or government employee. 28 U.S.C. § 2680(a). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). Because the exception applies "whether or not the discretion involved [was] abused," 28 U.S.C. § 2680(a), it is irrelevant whether the government employees were negligent. *Aragon,* 146 F.3d at 822.

To determine whether the discretionary function exception applies to the challenged conduct, this circuit employs the two-pronged test of *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). *See, e.g., Aragon*, 146 F.3d at 823. We have summarized the test as follows:

> The first step of the *Berkovitz* test requires this court to determine whether the challenged conduct "involves an element of judgment or choice," in which case it is discretionary and falls within the language of the exception, or whether it involves "a federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow," in which case the exception does not apply. *Berkovitz*, 486 U.S. at 536.

> If the conduct involves discretionary judgment under the first step of *Berkovitz*, then we must apply the second step, which requires this court to "determine whether that judgment is the kind that the discretionary function exception was designed to shield." *Id.* The exception protects only those discretionary actions or decisions which are "based on considerations of public policy." *Id.* at 537. The purpose is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536-37 (quoting *Varig Airlines*, 467 U.S. at 814).

*Kiehn v. United States*, 984 F.2d 1100, 1102-03 (10th Cir. 1993). Plaintiffs contend that the alleged negligent conduct satisfied neither prong of the *Berkovitz* test.

A.   ***Berkovitz* First Prong**

To prevail on the first prong, Plaintiffs must demonstrate that the challenged decision involved no "element of judgment or choice." *Id.* at 1102. They must show that Zion employees violated a federal statute, regulation, or

-8-

policy that is both "specific and mandatory." *Aragon*, 146 F.3d at 823. Plaintiffs point to three policies. They claim that Zion's failure to warn specifically of the algae hazard or to erect barriers at the Middle Emerald Pools constituted disobedience to (1) the National Park Service's Loss Control Management Guidelines (NPS-50); (2) Zion's Loss Control Management Program (Zion Management Plan, or Plan); and (3) the Zion safety committee's August 1995 "action plan" for dealing with hazards in the Emerald Pools area. We consider each in turn.

### 1. NPS-50

Plaintiffs argue that the NPS-50 required Zion to warn specifically of the algae hazard and otherwise protect against the danger of falling at the Middle Emerald Pools. The NPS-50 contains mandatory safety guidelines for the National Park Service (NPS). NPS-50, Ch. 1, at 2 (Jan. 1991). The issue before us is whether the guidelines are sufficiently specific to remove decisionmaking under them from the discretionary function exception.

Chapter 1 of the NPS-50 states that the objectives of the guidelines include (1) "Reducing the frequency and severity of accidents and losses for employees and visitors" and (2) "Providing for the safety and health of the public (visitors) from recognized hazards in NPS operations, on NPS lands, and in NPS facilities." *Id*. at 1.

Chapter 22 specifies the "minimum program requirements" for protecting visitors from "recognized hazards," and states that "every effort should be made to identify the hazards in the park/area that have caused or have the potential to cause, injury, illness, death or property damage to park visitors." *Id.*, Ch. 22, at 1. "[A]ll areas will provide any special materials, signs, and programs to alert the public of potential dangers." *Id.* at 2. "Brochures specific to the area should contain safety messages that direct attention to special hazards or attractions that could be potentially hazardous to the visitor," and the park safety officer "should review the signing of the park and determine if it is appropriate for the area signed and if it is in good repair." *Id.* at 2-3. Park employees are "responsible for identifying hazards within NPS areas that may cause injury, illness, death or property damage to park visitors and their property," and "[s]hould be able to impart accurate information to [the] public about locations, activities, climate and special environmental threats." *Id.* at 5.

The appendix to the NPS-50 contains a checklist for NPS personnel to indicate compliance with the NPS-50's provisions. That checklist requires a "yes" or "no" response to a number of items, including (1) "Deficiencies are corrected or the public otherwise protected or warned"; (2) "Brochures and other literature providing public safety information are available to all visitors; information is clearly identifiable and specific to existing hazards"; (3) "Warning

-10-

signs carry specific safety information which are easy to read and understand; signs are posted in the proximity of the hazard"; (4) "Inter-divisional cooperation toward visitor safety is in evidence through information provided during interpretive programs, at entrance stations, by maintenance personnel, etc."; and (5) "Accident/incident reports are reviewed to identify specific locations and sources of visitor injury; action plans are developed to mitigate problems." *Id.* at 31-32.

In our view, these provisions are not sufficiently specific to satisfy the first prong of the *Berkovitz* test. The NPS-50 certainly conveys the message that safety must be a priority, and it assists park management by focusing on a number of elements that should be encompassed by a safety program. But it does not dictate what actions park employees must take in response to particular problems. Indeed, the following language in the NPS-50's Introduction makes clear that safety decisions must be made in the special context of a national park and that park management retains substantial discretion:

> Paradoxically, many of the natural features found in parks pose significant safety risks to the uninformed visiting public, yet those same features cannot be eliminated nor guarded against in the same manner that a prudent person would expect to find in an industrial or home setting. Therefore, NPS public safety efforts are focused on interpreting the values of the park's natural features and educating the visitor concerning the proper precautions one must take to have a safe and healthful journey at that specific park unit.
>
> . . . .

This guideline has been prepared to provide both field units and office managers with sufficient information to develop a comprehensive safety and occupational health program. However, *each area must design its own safety and occupational health effort based on local circumstances and operations.*

*Id.*, Introduction, at iii (emphasis added).

We agree with the Ninth Circuit's characterization of the NPS-50 in *Blackburn v. United States*, 100 F.3d 1426 (9th Cir. 1996). There, the plaintiff had gravely injured himself when he dove off a bridge in Yosemite National Park. He claimed negligence with respect to inadequate warnings and the design and maintenance of the bridge. The court rejected the plaintiff's contention that the NPS-50 mandated particular warning signs.

Although the [NPS-50 and other NPS] policy manuals outline general policy goals regarding visitor safety, they do not set out the specific means by which the NPS employees are to meet these general goals. Furthermore, the policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards.

*Id.* at 1431.

In short, the NPS-50 does not remove Zion employees' choice or judgment regarding what measures to take. It does not "specifically prescribe[] a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. Hence, Plaintiffs cannot rely on the NPS-50 to remove the challenged conduct from the ambit of the discretionary function exception. *Cf. Duke v. Dep't of Agric.*, 131 F.3d 1407,

-12-

1410 (10th Cir. 1997) ("While these [Forest Service] manuals emphasize safety and appropriate warnings[,] they are not specific enough to eliminate the Forest Service employees' choice regarding how to act in particular circumstances."); *Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997) (NPS policy providing that "[t]he saving of human life will take precedence over all other management actions" is "too general to remove the discretion" from park employees' conduct); *Zumwalt v. United States*, 928 F.2d 951, 954 & n.4 (10th Cir. 1991) (national park's policy recommending improvements for "hazardous or difficult to follow" sections of a trail conferred "substantial discretion" upon park employees to "determine which sections of the [t]rail have proven to be hazardous or difficult to follow[,] . . . what type of improvements to make and where the improvements should be located . . . .").

2.  Zion Management Plan

Plaintiffs next contend that the Zion Management Plan imposed non-discretionary duties upon Zion employees to correct immediately the hazard at the Middle Emerald Pools. The Zion Management Plan contains guidelines intended to complement the NPS-50 in establishing specific direction for safety at Zion; it also sets forth procedures for investigating and reporting hazards. Under the Plan, when a hazard is identified as being an "imminent danger"—defined as an "immediately life threatening" condition—persons must be removed from the

-13-

scene and the danger must be "correct[ed] immediately." App. 00092, 00097. When a hazard is determined to be a "serious" danger–one "which may result in serious injury or illness"– persons must be removed from the scene and the danger must be "correct[ed] within 30 days." App. 00092, 00097. "Non-serious" hazards must be "correct[ed] within 45 days," and "technical" hazards must be "correct[ed] within 60 days." App. 00092.

One might read the above language to mandate that Zion employees promptly eliminate any life-threatening condition in the park, thereby divesting those employees of discretion. But we do not think that these provisions of the Zion Management Plan can be construed so broadly. Rather, the commands appear to be addressing only man-made hazards, or perhaps temporary hazards caused by natural forces (such as a rock slide). The timing requirements (such as "correct [the hazard] immediately") would make no sense if intended to require elimination of the numerous permanent, natural dangers which visitors may encounter at a national park. Is a precipice an "immediately life threatening" condition? How could the danger be eliminated immediately, or even within 30 days? Surely, the Plan does not require an unbreachable fence around the rim of every precipice. *Cf. Valdez v. United States*, 837 F. Supp. 1065, 1069 (E.D. Cal. 1993) (rejecting interpretation of NPS-50 as an "absolute directive" because such

an interpretation would require a fence or sign "at every attraction that is conceivably hazardous"), *aff'd* 56 F.3d 1177 (9th Cir. 1995).

Other provisions of the Plan indicate that it does not apply to permanent, natural hazards. For instance, the Plan's introduction states that it is the policy of the NPS "to furnish employees, concessioners and contractors with places and conditions of employment that are *free from recognized hazards* that are causing or are likely to cause death or serious physical harm." App. 00081 (emphasis added). But a national park like Zion can never be "free" from permanent, natural hazards. In addition, the "Safety Inspection Checklist," appended to the Management Plan, lists examples of the types of potential hazards that Zion employees must inspect and classify as "imminent," "serious," "non-serious," or "technical" dangers. App. 000102. The examples include such matters as "Electrical," "Explosion Hazards, Flammable," "Unsafe Practices or Procedures," and "Roads and Trails." None of the examples are permanent, natural hazards.

Perhaps, despite the above indications to the contrary, the Plan's mandates to "correct" various dangerous conditions could be interpreted to encompass permanent, natural hazards. But such an interpretation is plausible only if "correcting" a danger means something short of eliminating the danger. For example, although it may be impossible to eliminate the danger posed by a precipice, one could say that barriers or signs can "correct" the problem. If the

-15-

term "correct" is so interpreted, however, then the Plan does not remove discretion from Zion employees. They still must determine what, if anything, needs to be done to "correct" the hazard. The Plan fails to provide precise direction as to what suffices for a correction. *See Blackburn*, 100 F.3d at 1431.

We conclude that the Zion Management Plan does not exclude the conduct in this case from the discretionary function exception.

### 3. The August 1995 "Action Plan"

Finally, Plaintiffs argue that the Zion safety committee's August 1995 "action plan" prescribed a specific, non-discretionary course of action for Zion employees to follow with respect to the algae hazard at the Middle Emerald Pools. We disagree.

What the Plaintiffs term an "action plan" is a provision of an August 2, 1995, safety committee memorandum. That provision reads:

> Several members of the Safety Committee have hiked to the Emerald Pools area since the last meeting to determine if additional accident prevention work is needed. This was not in response to any pending accidents, but only to review this area of the park.
>
> The following action items were identified:
>
> • Reposition a few of the signs to more visible areas.
> • Consider natural barriers in some areas.

App. 000162.

After listing the suggested "action items," the memorandum continues: "Drawings or pictures will be developed showing these *recommendations*." *Id.* (emphasis added). On its face, then, this document contains "recommendations," not compulsory directives. Recommendations of Zion's safety committee are not mandatory; rather, the committee suggests a course of action to Zion's superintendent, who then decides whether to implement those recommendations. The recommendations did not deprive Zion management of discretion.

In sum, the guidelines and "action plan" relied on by Plaintiffs delegate extensive discretion to Zion managers. The managers must determine whether a hazard exists, the severity of the hazard, and whether physical barriers or signs are appropriate safety measures. When considering safety measures, they must assess such factors as whether the measures may actually encourage dangerous conduct by visitors (the existence of a barrier may cause visitors to underestimate the residual danger, and a sign warning of an extreme danger may cause visitors to minimize the peril identified by other signs); the size, placement, and content of signs; whether excessive signage may "numb" visitors; and whether signs or barriers are likely to withstand the elements (such as a flash flood). In addition, as discussed more fully below, the park managers must weigh any safety measure against its impact on the purposes of a national park.

Because no statute, regulation, or policy specifically prescribed a course of action for Zion employees to follow, the challenged conduct was discretionary under the first prong of the *Berkovitz* test.

## B.    *Berkovitz* **Second Prong**

Having concluded that decisions regarding the placement of warnings and barriers at the Middle Emerald Pools involved discretionary judgment, we must now determine under the second prong of the *Berkovitz* test "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

Only decisions "susceptible to policy analysis" are protected by the exception. *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The pertinent inquiry is whether the decision "implicates the exercise of a policy judgment of a social, economic, or political nature." *Duke*, 131 F.3d at 1411. Plaintiffs argue that it does not. In essence, they contend that the decisions regarding barriers and signs at the Middle Emerald Pools involved no policy analysis because the park officials' sole relevant consideration was public safety. We disagree. For one thing, park officials must weigh the cost of safety measures against the additional safety that will be achieved. Even inexpensive signs may not be worth their cost. (One FTCA plaintiff dove off a bridge lined by a granite block wall despite six

signs warning "DANGEROUS TO DIVE FROM BRIDGE." *Blackburn*, 100 F.3d at 1428. Would an additional sign have helped?)

More importantly, in a national park whose purpose is to preserve nature and display its beauty to the public, any safety measure must be weighed against damage to natural resources and aesthetic values. These considerations are expressed in NPS policy. The NPS is charged under the NPS Organic Act with

> promot[ing] and regulat[ing] the use of . . . national parks . . . by such means and measures as conform to the fundamental purpose of the said parks . . .which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. Park officials are thus required by statute to balance preservation with public access.

Various NPS operating manuals reflect this policy, requiring park management to consider the impact that any safety measure would have on a park's scenery and natural resources. For example, the NPS Management Policies manual states:

> Where practicable and not detrimental to NPS mandates to preserve park resources, known hazards will be reduced or removed. Where it would be inconsistent with congressionally designated purposes and mandates or where otherwise not practicable to make physical changes, efforts will be made to provide for persons' safety and health through other controls, including closures, guarding, signing, or other forms of education.

NPS Management Policies, Ch. 8:5-8:6 (Dec. 1988). Under that manual, park management must limit signs "to the minimum number, size, and wording required to serve their intended functions, so as to minimally intrude upon the natural or historic setting," and place signs "where they do not interfere with park visitors' enjoyment and appreciation of park resources." *Id.* at Ch. 9:11.

The NPS Sign Manual conforms to the Management Policies manual, instructing park management to "bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors." NPS Sign Manual, at 1-1 (Jan. 1988). Reflecting the difficulty of the choices that must be made, it adds that "[t]he decision to utilize a particular sign at a particular location requires the professional judgment of the park manager." *Id.*

In this case, the government contends that the decision not to post additional warning signs or erect barriers at the Middle Emerald Pools involved the consideration of a number of factors, including (1) the practicality and effectiveness of any change, (2) preservation of park resources and the natural environment, (3) preservation of visitors' enjoyment of the environment, and (4) cost. Plaintiffs counter that "Defendant has not and cannot point to a shred of objective, contemporaneous evidence, demonstrating that Zion National Park

-20-

officials considered the competing policy considerations" asserted as justification for failing to warn of or correct the hazard at the Middle Emerald Pools.

Plaintiffs misconceive the nature of the inquiry. Application of *Berkovitz's* second prong does not require proof of the thought processes of the pertinent decisionmakers. On the contrary, "courts should not inquire into the actual state of mind or decisionmaking process of federal officials charged with performing discretionary functions." *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1135 (10th Cir. 1999). *See Kiehn*, 984 F.2d at 1105 ("The lack of record evidence describing an analysis of public policy factors in the NPS decision not to post warnings is immaterial.") "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. If the decisionmaker's subjective intent were relevant to application of the discretionary function exception, summary judgment could be granted rarely, if ever, thereby prolonging disruptive litigation that the exception was intended to foreclose. *See Franklin Sav. Corp.*, 180 F.3d at 1134-41. The approach taken by the Supreme Court relies on objective factors:

> [I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations

. . . .

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.

*Gaubert*, 499 U.S. at 324. Accordingly, we presume in this case that the decisions at Zion were grounded in the NPS policies noted above.

Of course, the facts of the specific case may overcome the presumption to which the government is entitled under *Gaubert*. In certain circumstances, it may be obvious that a decision implicates none of the public policies that ordinarily inform an agency's decisionmaking. For example, in *Duke* we held that the discretionary function exception did not exempt the government's decision not to warn of falling rocks at a campground in the Gila National Forest. *Duke*, 131 F.3d at 1412. In that case, the government acknowledged that cost was not a factor in its decision. *Id*. And we could discern no public policy (such as preserving natural beauty) that was implicated by the decision not to install a warning sign at the campground, which was located on the side of a road that also served as a parking lot. *Id*. at 1411-12. *See also Boyd v. United States ex rel. U.S. Army, Corps of Eng'rs*, 881 F.2d 895, 898 (10th Cir. 1989) (government's "failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned").

-22-

That is not the situation here. The Middle Emerald Pools is not a parking lot, but a scenic attraction. The area may not be remote from civilization (it is near Zion's main lodge). Yet, because of its scenic value, many of the same interests are at stake as in cases recognizing the discretionary function exception as a defense to claims arising out of dangers in the wilderness. *See Kiehn*, 984 F.2d at 1105 ("The decision not to post warning signs in remote areas of a national monument inherently requires a balancing of public policy objectives, such as resource allocation, visitor safety and scenic preservation."); *Johnson v. United States Dep't of Interior*, 949 F.2d 332, 337 (10th Cir. 1991) (decisions regarding regulation of mountain climbing in Grand Tetons "[b]y their very nature, . . . involve balancing competing policy considerations pertaining to visitor safety, resource availability, and the appropriate degree of governmental interference in recreational activity"); *Zumwalt*, 928 F.2d at 955 (decision not to warn of known hazards along trail through wilderness area of national monument implicated protected policy decision to maintain trail in a wilderness state).

People visit the Middle Emerald Pools for the express purpose of seeing natural beauty. The Middle Emerald Pools could be made perfectly safe by installing around it a 10-foot-high chain link fence with spikes on top. But few would want to visit such a site. Zion officials have to decide the extent of safety precautions that can be justified in a scenic park. Physical barriers undoubtedly

spoil the view and the experience of communing with nature. Although some warning signs may be necessary, their number, size, and even content must be measured against the very purposes of a national park, which include to "conserve the scenery" and provide for public enjoyment. 16 U.S.C. § 1.

Plaintiffs contend that the government has not "explain[ed] how Zion National Park officials' alleged negligence in failing to warn Park visitors of the specific nature and location of the imminent death hazard posed by the sub-surface slippery algae at the Heaps Creek stream, was the result of any political, social or economic decisions the discretionary function exception was designed to protect." Appellant's Reply Brief 17. In our view, however, it is difficult to see how any means of warning here could fail to implicate public policy. Plaintiffs challenge the adequacy of the signage existing at the time of the accident, including the two signs that said, "Danger - Cliff. Slippery Sandstone. Unstable Rock Edge. Wet Rock Hazardous." But what would constitute an adequate warning: Bigger signs? Signs embedded in the sandstone immediately next to each stream? Such "solutions," however, have an impact on park aesthetics. And even if Plaintiffs are contending only that the wording of existing signs should have been altered to mention algae specifically, such a change would necessitate a chain of further decisions. Would not Zion managers then have to decide whether it is necessary to add signs that explain how to identify algae (Tyler's stepmother

-24-

testified that the algae blended with the rocks and was "not real noticeable," App. 000186) or that warn of the hazards of wet rock not covered by algae, and whether such additional signage would impair the scenery too much, as well as numb visitors to all warnings?

In the context of the Middle Emerald Pools, one cannot isolate a particular possible warning sign (or other safety measure, for that matter) and say whether its absence constitutes negligence. The adequacy of one safety measure depends on what other safety measures have been taken. If there is negligence, it is negligence in the design of the entire safety package. Yet park management must judge the totality of the safety package in terms of its impact on other public policies besides safety. Thus, it would be impossible to resolve Plaintiffs' negligence claims without evaluating decisions protected by the discretionary function exception.

We conclude that the second prong of the *Berkovitz* test has been satisfied and the government is entitled to the protection of the discretionary function exception. Accordingly, we need not consider Plaintiffs' argument that Zion would be liable in tort under Utah's Limitation of Landowner Liability Act, Utah Code Ann. § 57-14-1, *et seq.* When the discretionary function exception applies, it applies regardless of whether the discretionary acts themselves constitute actionable negligence. *Kiehn*, 984 F.2d at 1108; *Johnson*, 949 F.2d at 340.

## III. CONCLUSION

We AFFIRM the judgment of the district court.

