

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-20-2008

# Merando v. USA

Precedential or Non-Precedential: Precedential

Docket No. 06-4657

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Merando v. USA" (2008). *2008 Decisions.* Paper 1494.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1494

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-4657

———————

ANTON MERANDO, AS GENERAL ADMINISTRATOR
AND ADMINISTRATOR AD PROSEQUENDUM
OF THE ESTATES OF KATHLEEN MERANDO
AND KAYLYN MERANDO,

Appellant

v.

UNITED STATES OF AMERICA; COUNTY OF SUSSEX;
TOWNSHIP OF WALPACK; PUBLIC
SERVICE ELECTRIC AND GAS;
JOHN DOES 1-10 (SAID NAMES BEING FICTITIOUS);
XYZ CORPS. 1-10 (SAID NAMES BEING FICTITIOUS);
JERSEY CENTRAL POWER AND LIGHT

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 04-3288)
Honorable Garrett E. Brown, Jr., District Judge

———————

Submitted under Third Circuit LAR 34.1(a)
December 14, 2007

BEFORE: RENDELL, GREENBERG, and
VAN ANTWERPEN, Circuit Judges

(Filed: February 20, 2008)

———————

Richard A. Grodeck
Feldman Grodeck
80 Main Street
West Orange, NJ 07052

    Attorneys for Appellant

Christopher J. Christie
United States Attorney
Pamela Perron
Assistant U.S. Attorney
970 Broad Street
Newark, NJ 07102

    Attorneys for Appellee

––––––––––

OPINION OF THE COURT

––––––––––

GREENBERG, <u>Circuit</u> <u>Judge</u>.

    This case comes on before this Court on an appeal from an order of the District Court entered October 5, 2006, dismissing a complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). <u>Merando v. United States</u>, Civ. No. 04-3288, 2006 WL 2865486 (D.N.J. Oct. 5, 2006). The action arose in the aftermath of a tragedy when on August 11, 2003, a tree in the Delaware Water Gap National Recreation Area fell onto a roadway and crushed a passing car driven by Janine Noyes in which Kathleen Merando and her nine-year old daughter Kaylyn Merando were passengers. Mrs. Merando and Kaylyn were killed instantly. Anton Merando, Mrs. Merando's husband and Kaylyn's father, filed this action alleging that the Government negligently pruned and failed to find and remove the hazardous tree. But the District Court dismissed the case as it concluded that the discretionary function exception to the Federal Tort Claims Act deprived it of subject matter jurisdiction and thus immunized the Government from suit. We will affirm.

2

## I. FACTS AND PROCEDURAL HISTORY

The Delaware Water Gap National Recreation Area ("Park") occupies 63,000 acres in New Jersey and Pennsylvania along the Delaware River. The Park primarily is forested land accessed by 169 miles of roadways, 68 miles of trails, and several streams. The developed areas include campgrounds, boat launch areas, visitor centers, picnic areas, historic sites, and parking lots. The Pennsylvania side of the Park contains more of the developed attractions and thus more people visit it than visit the New Jersey side which does not have developed beaches, boat launches, or visitor centers. The National Park Service, an agency within the Department of the Interior, manages the Park.

On August 11, 2003, Noyes was driving her car southerly on Route 615 on the New Jersey side of the Park with Kathleen and Kaylyn Merando as passengers. Noyes drove the car by a twenty-seven foot tall red oak tree that was about six yards off the road. The Government took title to the land where the oak tree was situated in 1969 and to the roadway itself in 1996. The tree's natural growth caused it to lean with its branches extending over the roadway. More than ten years before the tragedy here, an unknown person wielding a chainsaw had "topped" and delimbed the tree, leaving it standing in a "Y" shape with no bark or branches and with the dead tree pole leaning toward the roadway. As their car passed nearby the tree fell and crushed the car instantly killing Mrs. Merando and Kaylyn.

On July 9, 2004, Anton Merando filed his complaint in the District Court which he amended on August 2, 2004. He originally sued the United States of America, Sussex County, Walpack Township, Public Service Electric and Gas, Jersey Central Power and Light, John Does 1-10, and XYZ Corps. 1-10 but except for the United States of America all are no longer parties to this case.

Mr. Merando alleged that the District Court had subject matter jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2679. In count one of his amended complaint, he alleged that the Government as well as

3

all the other defendants negligently pruned the tree causing it to die and eventually collapse, killing the decedents. In count two, he alleged that the tree constituted a hazardous and extremely dangerous condition of which the Government and all the other defendants knew or should have known and that all the defendants negligently failed to act to remove the tree, killing the decedents. In count three, he alleged that the decedents sustained severe injuries resulting in pain and suffering that continued until their deaths.

The Government moved to dismiss the amended complaint for lack of subject matter jurisdiction on the basis of the discretionary function exception to the FTCA, and on October 5, 2006, the District Court granted the motion. While the Government also filed a motion to dismiss the complaint for failure to state a claim, arguing that the New Jersey Landowners Liability Act, N.J. Stat. Ann. §§ 2A:42A-2 to 10 (West 2000), barred the action, inasmuch as the District Court found that it did not have subject matter jurisdiction, it did not address that motion.

On October 26, 2006, Mr. Merando filed a timely notice of appeal.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over the final order of the District Court pursuant to 28 U.S.C. § 1291 and exercise plenary review over application of the FTCA's discretionary function exception. See Mitchell v. United States, 225 F.3d 361, 362 (3d Cir. 2000). We resolve the question of whether the District Court had subject matter jurisdiction by this opinion.

## III. DISCUSSION

### A. The Discretionary Function Exception

4

The United States of America, as a sovereign, is immune from suit unless it consents to be sued. United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980) (citing United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941)). Nevertheless, under the FTCA, the United States has waived its sovereign immunity for:

> claims . . . for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); see also 28 U.S.C. § 2674.

The FTCA carves out a "discretionary function" exception, however, which provides that the Government cannot be sued for any claim based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The plaintiff, here Mr. Merando, bears the burden of demonstrating that his claims fall within the scope of the FTCA's waiver of government immunity, In re Orthopedic Bone Screw Prod. Liab. Litig., 264 F.3d 344, 361 (3d Cir. 2001), but "'[t]he United States has the burden of proving the applicability of the discretionary function exception.'" Cestonaro v. United States, 211 F.3d 749, 756 n.5 (3d Cir. 2000) (quoting Nat'l Union Fire Ins. v. United States, 115 F.3d 1415, 1417 (9th Cir. 1997)).

The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2762 (1984). The

5

exception's purpose is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  Id. at 814, 104 S.Ct. at 2765.

Courts make two-part inquiries to determine whether the discretionary function exception applies in any particular case. United States v. Gaubert, 499 U.S. 315, 322-23, 111 S.Ct. 1267, 1273-74 (1991).  First, a court must determine whether the act giving rise to the alleged injury and thus the suit involves an "element of judgment or choice."  Id. at 322, 104 S.Ct. at 1273 (quoting Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958 (1988)).  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'"  Id. (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1958-59); see also Mitchell v. United States, 225 F.3d at 363; Cestonaro, 211 F.3d at 753.  The Supreme Court has stated:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation.  If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.  On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

Gaubert, 499 U.S. at 324, 111 S.Ct. at 1274 (internal citation omitted).

6

Second, even if the challenged conduct involves an element of judgment, the court must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." Id. at 322-23, 111 S.Ct. at 1273.

> Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

Id. (internal quotation marks and citations omitted). The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." Id. at 325, 111 S.Ct. at 1275; see also Mitchell, 225 F.3d at 363-64; Cestonaro, 211 F.3d at 753; Sea-Land Serv. Inc. v. United States, 919 F.2d 888, 892 (3d Cir. 1990).

### B. The Challenged Government Conduct

Before we can make the two-part Gaubert inquiry to determine whether the discretionary function exception immunizes the Government from a suit based on its conduct, we must identify the conduct at issue. Cestonaro, 211 F.3d at 753. Mr. Merando contends that the conduct for purposes of the discretionary function exception analysis is twofold: first, that the Park Service's Roads and Maintenance crews negligently "topped" the tree without removing it; and second, that the crews negligently failed to find and remove the "topped" tree. He contends that the discretionary function exception does not apply here because the Park Service's unwritten hazardous tree management plan mandated the crews never to "top" trees but rather to identify and remove hazardous trees as they drove the roads of the Park.

7

On the other hand the Government contends that the conduct at issue is the Park Service's decisions that comprise its hazardous tree management plan and its execution of that plan.

To aid us in our analysis, we review Autery v. United States, a case that is remarkably similar to this case. 992 F.2d 1523 (11th Cir. 1993); see also Rosebush v. United States, 119 F.3d 438, 441-42 (6th Cir. 1997) (relying on Autery in determining what conduct was at issue when plaintiffs sued the Government for negligently failing to maintain fire pit at campground). In Autery, a black locust tree fell on a passing car in the Great Smokey Mountain National Park, killing one passenger and injuring another. 992 F.2d at 1524. At the time of the accident, the Park Service had an unwritten policy "to make every reasonable effort within the constraints of budget, manpower, and equipment available to detect, document, remove, and prevent tree hazards." Id. at 1525. To implement this policy, Park Service personnel "initially conducted visual inspections from trucks driven along the road. Any tree that appeared hazardous was then inspected more closely." Id. In the Autery situation Park Service personnel received information regarding the risks posed by black locust trees in the park. After a bench trial, the district court found that the Government "had negligently failed to (1) devise, implement and follow an appropriate tree hazard management plan; (2) properly maintain the National Park area; (3) properly inspect the trees in the National Park in the area where the accident occurred; and (4) identify and remove the hazardous trees which fell and struck [the victims]." Id. at 1524.

On appeal, the Court of Appeals for the Eleventh Circuit confronted the question of identifying the conduct at issue for purposes of a discretionary function exception analysis. The Government argued that the conduct was the Government's "decision to establish and implement a tree inspection program," while the plaintiffs contended that the conduct was "the park's failure to carry out the mandates of its then existing policy of identifying and eliminating known hazardous trees." Id. at 1527 (quotation marks omitted). The district court had held that "the inquiry . . . is whether the Park Service officials had discretion

under their Tree Hazard Management Plan to remove 'hazardous' trees." Id.

The court of appeals, however, stated:

The government's focus on the decision to establish a tree inspection plan is too broad; as plaintiffs concede, the government had the discretion to adopt or not adopt a plan at all. The more important question is whether any statute, regulation or agency guideline specifically provided that if a tree inspection plan were developed, it would have to include particular inspection procedures.

Id. (footnote omitted). The court continued:

Plaintiffs' and the district court's focus, on the other hand, is too narrow. The particular inquiries posed by plaintiffs and the district court are based on misinterpretations of the law. Plaintiffs' support their contention that the discretionary function exception does not apply to the manner in which park personnel administered the inspection plan by relying on Fifth Circuit cases that had held that the government was not protected when it was performing an operational function. The Supreme Court squarely rejected this proposed distinction in Gaubert, ruling that the Fifth Circuit 'erred in holding that the [discretionary function] exception does not reach decisions made at the operational or management level.' Gaubert, 499 U.S. at 325, 111 S.Ct. at 1275. 'Discretionary conduct is not confined to the policy or planning level.' Id.; see also Varig Airlines, 467 U.S. at 813, 104 S.Ct. at 2764 ('[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.').

9

Id. at 1527-28 (internal citations, quotation marks and footnote partially omitted). The court added:

> The district court's inquiry, on the other hand, by asking whether the park officials had discretion to remove 'hazardous' trees, begs the question. The tree inspection program was designed to identify which trees were hazardous. Whether park personnel had discretion in executing that plan is the relevant issue. The district court's analysis appears to collapse the question of whether the Park Service was negligent into the discretionary function inquiry. That is, after finding that the Park Service had knowledge of the danger of black locust trees, the district court imposed a 'reasonableness' requirement on the government's conduct.

Id. at 1528. The court concluded:

> It is the governing administrative policy, not the Park Service's knowledge of danger, however, that determines whether certain conduct is mandatory for purposes of the discretionary function exception. The FTCA expressly provides that the exception applies to policy judgments, even to those constituting abuse of discretion. Therefore, the relevant inquiry here is whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner. If not, then the Park officials' decision to employ a particular inspection procedure – and its execution of that plan – is protected by the discretionary function exception.

Id. (internal citations and quotation marks omitted). Ultimately, the court of appeals held that the discretionary function exception immunized the Government from a lawsuit based on the decisions Park Service personnel made in designing and implementing the park's unwritten tree inspection program, and

10

thus the court dismissed the case for lack of subject matter jurisdiction.

Mr. Merando presents an argument that is very similar to the plaintiffs' argument and the district court's decision in Autery. He contends that the conduct at issue is the Government's alleged failure properly to prune, find, and remove the hazardous tree.

Mr. Merando's allegation that the Government negligently pruned the tree causing it to decay and collapse implies that it was the Government that topped the tree. But this allegation is unsupportable because Mr. Merando has not shown that the Government in any way was involved in the topping of the tree either by consenting to its topping or actually topping it itself. In reaching this conclusion, we recognize, of course, that the Government took title to the site of the tree in 1969. Moreover, we realize that Mr. Merando contends in his brief that "according to the evidence" the tree was topped "during the 30+ years after the [National Parks Service] took title to it in 1969," therefore suggesting that it controlled the tree when the unknown person topped it. Appellant's Br. at 14.

We cannot, however, draw any inference from this chronology of events as it cannot be inferred that, against Government policy not to top trees, it was the Government that topped the tree or that it consented to its topping merely because it may have owned the land on which the tree was situated when the unknown person topped it. After all, in Mr. Merando's answers to interrogatories he tells us that "[i]t is understood from documents which have been produced in discovery . . . that the County of Sussex retained responsibility for tree trimming and clearance even after jurisdiction for the County Road was transferred to the United States of America" in 1996, app. at 281, thus suggesting that Sussex County topped the tree. On the other hand, in an uncontested motion for summary judgment Sussex County asserted that "[t]he identity of the company or individuals who topped the tree is unknown" but that the "tree was topped presumably by a power company." Furthermore, there would be no basis to infer that the Government consented to the topping of the tree or actually topped it merely because the

11

tree was situated in a 63,000 acre park at a location that it may have owned when the unknown person topped the tree.  Clearly, too many different entities had access to the tree to permit a trier of the fact to draw that inference.

In sum, there is simply neither direct evidence nor evidence from which an inference can be drawn that the Government topped the tree and this absence of evidence as a factual matter eliminates from this case Mr. Merando's claim that Park Service personnel violated a mandatory policy not to "top" trees.[1]

Accordingly, we only will analyze the other aspect of Mr. Merando's claim:  his challenge to the Government's alleged negligent failure to find and remove the tree.  Mr. Merando argues that the Park Service's crews did not have discretion not to find and remove the hazardous tree.  Like the district court's decision in <u>Autery</u>, however, Mr. Merando's argument begs the question.  The Park Service designed its hazardous tree management plan, which we detail below, to identify which trees were hazardous.  The relevant issue here is whether the Park Service had discretion in formulating and executing that plan.

Mr. Merando's claims regarding the Government's alleged negligent failure to find and remove the tree essentially are a challenge to the Park Service's plan for finding and managing hazardous trees.  The Park Service's plan and its execution of that plan constitutes the conduct at issue for purposes of the discretionary function exception analysis.  Like the plaintiffs' argument in <u>Autery</u>, Mr. Merando's focus on the actions of the Park Service crews simply is too narrow.  The relevant inquiry is whether the controlling statutes, regulations, and administrative policies mandate that the Park Service locate and manage hazardous trees in any specific manner.  If not, the

---

[1]Clearly we can examine the facts with respect to the identity of the person who topped the tree on this appeal from a dismissal predicated on the want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  <u>See</u> <u>Cestonaro</u>, 211 F.3d at 752.

Park Service's decisions as to the precise manner in which to do so, and its execution of those decisions, clearly fall within the discretionary function exception to the government's tort liability. See also Varig Airlines, 467 U.S. at 819-20, 104 S.Ct. at 2767-68 (discretionary function exception protects both Government's decision to "spot-check" airplanes for compliance with safety regulations and execution of those "spot-checks" by Government personnel).

>    C.  Whether the Discretionary Function Exception
>    Immunizes the Government from a Lawsuit Based
>    on its Conduct

Now that we have identified the Government's conduct at issue in this case, we determine whether the discretionary function exception immunizes it from a lawsuit based on that conduct. In this inquiry we first must decide whether a statute, regulation, or policy required the Park Service to locate and manage hazardous trees in any specific manner, or whether the Government's actions were discretionary because they involved an "element of judgment or choice." Gaubert, 499 U.S. at 322, 111 S.Ct. at 1273.

The National Park Service was established to

>    promote and regulate the use of the Federal areas known
>    as national parks, monuments, and reservations . . . by
>    such means and measures as conform to the fundamental
>    purpose of the said parks, monuments, and reservations,
>    which purpose is to conserve the scenery and the natural
>    and historic objects and the wild life therein and to
>    provide for the enjoyment of the same in such manner and
>    by such means as will leave them unimpaired for the
>    enjoyment of future generations.

16 U.S.C. § 1. The Park Service's specific mission for the Delaware Water Gap National Recreation Area is to maintain the property "for public outdoor recreation use and enjoyment . . . by the people of the United States and for preservation of the scenic, scientific, and historic features contributing to public enjoyment of such lands and waters . . . ." 16 U.S.C. § 460o.

13

In the administration of the Park, "the Secretary of the Interior may utilize such statutory authorities relating to areas of the national park system and such statutory authorities otherwise available to him for the conservation, management, or disposal of vegetative, mineral, or fish or wildlife resources as he deems appropriate . . . ." 16 U.S.C. § 460o-3. Moreover, the Secretary

> shall adopt and implement . . . a land and water use management plan, which shall include specific provision for, in order of priority – (1) public outdoor recreation benefits; (2) preservation of scenic, scientific, and historic features contributing to public enjoyment; (3) such utilization of natural resources as in the judgment of the Secretary of the Interior is consistent with, and does not significantly impair, public recreation and protection of scenic, scientific, and historic features contributing to public enjoyment.

16 U.S.C. § 460o-4.

The Park Service's "Management Policies 2001" manual sets out its visitor safety policy:

> The saving of human life will take precedence over all other management actions as the Park Service strives to protect human life and provide for injury-free visits. The Service will do this within the constraints of the 1916 Organic Act. The primary – and very substantial – constraint imposed by the Organic Act is that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values. . . . When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values . . . .

14

These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing.

App. at 368. Significantly, nothing in the above-quoted statutes or policies mandates how the Government should locate or deal with hazardous trees.

In addition to these statutes and policies, the Park Service issued a 1991 document entitled "Natural Resources Management Guidelines," containing a "Hazardous Tree" section that "provides the foundation for each park to implement its own hazardous tree management plan . . . , and also to provide a general scheme for such plans." App. at 177. This section states in pertinent part:

The following guidance may be used in developing a park plan. Each plan must be tailored to a park's particular requirements according to vegetation type(s), type of visitor use areas, frequency of visitation, and other factors.

. . . .

Periodically, any trees which stand within falling distance of public use areas and which might pose a hazard to the public or significant property should be systematically inspected for flaws. The form and frequency of routine inspection or surveillance will depend on the type of visitor use areas (which will be defined later). The constraints of manpower available to a park may not permit periodic inspection of all pertinent areas. . . . Frequency of inspection as called for in the [hazardous tree management plan] becomes a local issue keyed to the nature of the park and visitor use.

15

. . . .

Any tree denoted as hazardous should be promptly cared for, using the best arboricultural techniques, to eliminate the hazardous status of the tree. If it cannot be made safe, or if the effort to make it safe would be too costly in terms of manpower or dollars, then the tree may be removed.

. . . .

Deliberate visual inspections of transportation corridors should include all trees that could affect the roadway. Areas that may be screened or otherwise difficult to view from the road should be given a walk-through inspection. Drive-by inspections may not catch all flaws in the trees along roadways. However, it is generally recognized that it may not be realistically possible to walk by all trees along miles of roadways, and under these conditions a documented drive-by inspection should be considered satisfactory.

App. at 179-83.

The 1991 guidelines – which explicitly state that they "may be used" – do not mandate any particular methods of hazardous tree identification or removal. Instead, they make suggestions that Park officials are free to accept or reject. Thus, according to Park Superintendent John Donahue, although "the Park has used this guideline as a reference point in its attempt to draft a workable hazard tree management plan," the Park officials have not "been able to institute such a plan." App. at 291.

Although the Park Service has not instituted a written hazardous tree management plan, its Roads and Trails crews follow an unwritten plan for identifying and removing hazardous trees in the Park. In areas of high visitor usage, i.e., where people are known to congregate and buildings are located, the Roads and Trails crews inspect trees on foot, looking at

16

individual trees. In undeveloped, low usage areas, Roads and Trails crews perform "windshield inspections": while driving they survey the scene for dangerous conditions. If a tree or limb impedes traffic on the road, is leaning into the road, overhangs the road, or otherwise is made known to the crew as defective, the crew gets out and examines the tree more closely. There is no specific route or schedule for windshield inspections.

Once a Park Service crew identifies a hazardous tree, it will take steps to manage the problem the same or the next day, depending on the availability of proper equipment. Pursuant to the unwritten policy, Park Service crews will not top trees and leave the trunk standing, because a topped tree quickly will die and become hazardous.

In considering whether the discretionary function exception protected the Government in this case, the District Court looked to three cases for guidance. Because we, too, find that these cases are particularly useful for our analysis, we will review them as well.

In Varig Airlines the Supreme Court held that the discretionary function exception immunized the Government from suit for its alleged negligence in certifying two separate planes for use in commercial aviation. 467 U.S. at 821, 104 S.Ct. at 2768. The Government had devised a system of compliance review in which it would "spot-check" aircraft manufacturers' own inspections and tests to establish that an aircraft design conformed to safety regulations. Id. at 816-17, 104 S.Ct. at 2766. The Court stated that the plaintiffs' "contention that the FAA was negligent in failing to inspect certain elements of aircraft design before certificating the [aircraft] necessarily challenges two aspects of the certification procedure: the FAA's decision to implement the 'spot-check' system of compliance review, and the application of that 'spot-check' system to the particular aircraft involved in these cases." Id. at 819, 104 S.Ct. at 2767. The Court concluded that the discretionary function exception immunized the Government's decision to implement the "spot-check" system, and stated:

the FAA has determined that a program of 'spot-checking' . . . best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

Id. at 819-20, 104 S.Ct. at 2767-68. The Court also determined that "the acts of FAA employees in executing the 'spot-check' program in accordance with agency directives are protected by the discretionary function exception as well," because the employees were

specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources.

Id. at 820, 104 S.Ct. at 2768.

In Mitchell v. United States we concluded that the discretionary function exception immunized the Government from a lawsuit brought by a plaintiff whose car collided with a concrete head-wall at the end of a drainage ditch in the Delaware Water Gap National Recreation Area. 225 F.3d at 366. We found that the National Park Service's decision about how and when to reconstruct the road was a discretionary decision that required the Park Service to "balance its mission of preserving the parklands against the severity of design flaws and the different levels of deterioration of the road." Id. at 364. We stated that "[t]he Service's choice to focus on a few highly dangerous portions of the road rather than to distribute its finite resources along the whole of Route 209 is a policy choice this court should not second-guess." Id.

18

The District Court here also considered Autery, which we discussed above when determining what the Government's conduct was that was at issue in this case. In Autery, as we have noted, a tree fell on a car as it drove through the Great Smokey Mountain National Park, killing one passenger and injuring another. At the time of the accident, the Government had an unwritten policy under which its personnel would conduct visual inspections of trees while driving along the road, and more closely inspect any tree that appeared hazardous. The issue before the court of appeals was "whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner. If not, then the Park officials' decision to employ a particular inspection procedure – and its execution of that plan – is protected by the discretionary function exception." Id. at 1528. The court found that there was no policy establishing a mandatory requirement so as to deprive Government personnel of discretion, and that "the inspection plan in effect at the time of the accident did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week." Id. at 1529. The court also noted that "there was no evidence presented in the district court that park personnel did not fully comply with the tree inspection procedure." Id. at 1530. The court then determined that the Government's discretionary conduct was susceptible to policy analysis:

> To decide on a method of inspecting potentially hazardous trees, and in carrying out the plan, the Park Service likely had to determine and weigh the risk of harm from trees in various locations, the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available.

Id. at 1531. Accordingly, the court held that the discretionary function exception deprived it and the district court of jurisdiction over a suit against the Government based on the decisions made by Government personnel in designing and implementing the unwritten tree inspection program in the park. Id. at 1531.

We conclude that the controlling statutes, regulations, and policies that led to the creation of the Park Service's unwritten plan did not mandate any particular methods of hazardous tree management. As the District Court noted, the Park Service "was responsible for choosing the methods by which it maintained the Park and protected its visitors. The [Park Service's] decisions concerning tree inspections, i.e. using windshield inspections for lower usage areas, involved the type of judgment or choice that the discretionary function exception protects." Merando, 2006 WL 2865486, at *6. Like the Government's hazardous tree management plan in Autery, the unwritten inspection plan in this case "did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week." Id. at 1529. In these circumstances, both the Government's decision to implement "windshield inspections" for low usage areas of the Park and its selection of the method of execution of those inspections by Park Service personnel required the exercise of discretion.

Furthermore, both the Park Service's decision to implement the "windshield inspection" program and the execution of those inspections by Park personnel are susceptible to policy analysis, and thus they satisfy the second prong of the Gaubert inquiry for the Government to have immunity for its conduct. The Government had to consider how best to use its limited financial and human resources in a manner that balanced visitor safety with visitor enjoyment and conservation of the Park. See 16 U.S.C. § 1. Moreover, as in Autery, the Government had to "determine and weigh the risk of harm from trees in various locations [and] the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available." 992 F.2d at 1531.

Mr. Merando attempts to distinguish Autery, contending that "[t]he Eleventh Circuit found that park inspections there (windshield inspections) were not mandated to be conducted in a specific manner, like daily, unlike the inspections here, and consequently held that the exception applied. . . . Here the windshield inspections were required to be conducted on Route 615 as the crews traveled it day-to-day, and Park policy

20

<u>mandated</u> that topped trees be reported for removal."
Appellant's rep. br. at 7.

Mr. Merando is incorrect. While the Park Service's unwritten plan required personnel to scan for hazardous trees as they drove the Park's roads, there is no statute, regulation, or policy dictating the specifics of that requirement; i.e., Park Service personnel were not told when or how often to drive Route 615, or when to exit their vehicles to conduct individual tree inspections. This case clearly is on all fours with <u>Autery</u>. Moreover, although Park Service personnel were required to report a hazardous tree if they were aware of it, there is no evidence that they saw the tree that fell on the Merandos. Whether they would have been required to report the tree if they had seen it therefore is irrelevant to our analysis. Indeed, we will assume that it is likely that Park Service personnel would have identified and removed the hazardous tree if they had conducted a close-up, individual inspection of the tree and thus this tragedy would not have happened. But because of the Park Service's decision to implement "windshield inspections" in low usage areas of the Park, Park Service personnel did not find and remove the tree. The discretionary function exception immunizes the Government from a lawsuit based on these circumstances.

We are struck by the similarity of Park Service's "windshield inspections" to the FAA's "spot-check" program in <u>Varig Airlines</u>. In both situations, the Government was required to "establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." <u>Varig Airlines</u>, 467 U.S. at 819, 104 S.Ct. at 2767. Like the claims in <u>Varig Airlines</u>, Mr. Merando's claims in this case necessarily challenge both the Park Service's decision to implement the "windshield inspection" program and the acts of the Park Service employees in carrying out that program. Their conduct here is indistinguishable in a legal sense from the FAA's conduct in <u>Varig Airlines</u> which the Supreme Court held to be protected by the discretionary function exception.

21

Mr. Merando argues that the FAA's implementation of the "spot check" program in Varig Airlines is distinguishable from the Park Service's decision to implement the "windshield inspection" program here, because "the decision [in Varig Airlines] to use representative sample inspections was a resource-driven, discretionary act, intentionally leaving the vast majority of designs and individual planes uninspected," while in this case "all of Route 615 was routinely driven, and all of its cognizable trees were to be inspected in that process. No 'sampling' ever occurred, nor did the Park's employees describe a policy to sample by inspecting only certain areas of Route 615 as representative of the rest." Appellant's rep. br. at 4-5.

Mr. Merando, however, has not sufficiently distinguished these two cases: like the decision in Varig Airlines, the Government's choice here to use "windshield inspections" in low usage areas of the Park was a discretionary decision, driven by limited resources, not to individually inspect every potentially hazardous tree in the Park, even if that meant that some hazards would remain unidentified. There is no escape from the fact that in forested areas trees always can fall and pose a danger to any person in the area and it is not only entirely appropriate that Government personnel have discretion as to what trees to inspect and how to make the inspections but necessary that they have that discretion. Accordingly, it is clear that the execution of the "spot check" program in Varig Airlines by FAA personnel, where the personnel were "specifically empowered to make policy judgments," mirrors the execution of the "windshield inspection" program by the Park Service in this case, where the personnel were not given a specific inspection plan mandating the particular trees to inspect or the routes to drive.

The Park Service's determination on how to distribute its finite resources to locate and remove hazardous trees also is similar to the decision the Park Service faced in Mitchell, where the Park Service had to decide how to improve a long stretch of dangerous and deteriorating roadway. Here, knowing that it could not inspect every tree in the Park, the Park Service decided to expend the bulk of its resources on high-visitor use areas of the Park. Like the Government decision in Mitchell, the Park

22

Service's decision in this case represents "a policy choice this court should not second-guess." Mitchell, 225 F.3d at 364.

Mr. Merando argues that this case differs from Mitchell because in Mitchell "the Park knew . . . that the road culvert in question might be a safety hazard, but allocated its finite resources to other, more pressing road projects," while in this case "the Park did not concede that it knew any hazardous trees existed on Route 615, claimed it did not know the topped tree on Route 615 which killed the Merandos existed, and was not following any Park improvement, or resource plan which prevented it from knowing or from reporting it for removal." Appellant's rep. br. at 5-6.

Mr. Merando does not explain why his purported distinction between these two cases is relevant to the question at hand and we think that the difference in the facts does not create a legal distinction between the situations. To start with it would be strange to hold that the Government could be liable for injuries caused by a risk of which it was unaware but not be liable for risk caused by a danger of which it was aware but chose not to remedy. If anything it might be thought that courts would reach the opposite result. In any event, the Park Service knew that every tree in the Park could become hazardous to the safety of its visitors, employees, and property, which is why it decided to implement the inspection program. Moreover, and contrary to Mr. Merando's claim in his reply brief, the Park Service was following a "resource plan" – namely, its hazardous tree management plan, which took into account the resources available for locating and removing hazardous trees throughout the Park. As in Mitchell, the Park Service made a decision to "allocate[ ] its finite resources to other, more pressing [ ] projects," Appellant's rep. br. at 5, when it decided to conduct more thorough inspections in high-use areas of the Park and implement the "windshield inspection" program in the area of the Park where the tree was located. Thus, Mr. Merando's claimed distinction between this case and Mitchell is incorrect.

In these circumstances, the District Court correctly concluded that the discretionary function exception immunized the Government from a lawsuit based on its decisions regarding

23

the maintenance of the Park and the carrying out of that maintenance by the Roads and Trails crew. While we recognize that there was a terrible event with awful consequences here, unfortunately for Mr. Merando the courts simply do not have jurisdiction over his suit.

### D. The New Jersey Landowners Liability Act

In the District Court and on this appeal, the Government also argued that the courts should dismiss Mr. Merando's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because the New Jersey Landowners Liability Act, N.J. Stat. Ann. §§ 2A:42A-2 to 10 bars the action. Inasmuch as we have concluded that by reason of the discretionary function exception to the sovereign immunity waiver the federal courts do not have jurisdiction over this case and we thus will affirm the order of October 5, 2006, dismissing this action on that basis, we do not consider the New Jersey statute.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the decision of the District Court of October 5, 2006. No costs shall be taxed on this appeal.

———————

24