PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4011
_____

S.R.P. (a minor),
by and through Maria Rivera Abunabba
(as mother and next of kin)

S.R.P.,
Appellant

v.

UNITED STATES OF AMERICA;
NATIONAL PARK SERVICE,
U.S. DEPARTMENT OF INTERIOR
_____

On Appeal from the District Court
of the Virgin Islands – Appellate Division
Division of St. Croix
(D.C. No. 1-06-cv-00080)
District Judge:  Honorable Raymond L. Finch
_____

Argued December 5, 2011
Before:  FISHER, GREENAWAY, JR. and
ROTH, *Circuit Judges*.

(Filed: April 10, 2012)

Pamela L. Colon (Argued)
27 & 28 King Cross Street
Phoenix Court Business Complex
Christiansted, St. Croix, USVI 00820
        *Counsel for Appellant*

Thomas M. Bondy
Lowell V. Sturgill, Jr. (Argued)
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Angela P. Tyson-Floyd
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, VI 00820
        *Counsel for Appellees*

_____

## OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

S.R.P., a minor, appeals from an order of the District Court dismissing his claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

2

The action arose out of a 2004 incident in which S.R.P. was bitten by a barracuda while playing near the shore of Buck Island Reef National Monument ("Buck Island Monument" or "the Monument"). S.R.P., through his mother, filed suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, alleging that the Government negligently failed to warn of the danger posed by barracudas to shallow water bathers. The District Court dismissed the case on the basis that the discretionary function exception to the FTCA deprived it of jurisdiction, and thus immunized the Government from suit. For the reasons set forth below, we will affirm.

## I. Facts and Procedural History

On May 9, 2004, while sitting on the beach at Buck Island ("Buck Island" or "the Island") with his feet in shallow water, then 12-year-old S.R.P. was bitten by a barracuda and suffered a severe laceration to his foot. His third and fourth toes were nearly severed and surgery was required to repair the damage. Buck Island is located 1.25 miles off the northeast side of the island of St. Croix in the U.S. Virgin Islands. It is a unit of the National Park System under the control and management of the National Park Service ("the NPS"). Prior to 2001, Buck Island Monument included Buck Island itself and 704 marine acres surrounding the island. In 2001, President Clinton issued an executive proclamation expanding the boundaries of the Monument, designating the surrounding 18,869 marine acres as a protected area, and directing the Secretary of the Interior to "prohibit all extractive uses." Proclamation No. 7392, 66 Fed. Reg. 7336

3

(Jan. 17, 2001).  Pursuant to this directive, in 2003, Buck Island and its surrounding waters were closed to fishing.

Buck Island is accessible only by watercraft, and is open to the public for recreational activities, such as swimming, picnicking, hiking, snorkeling, and scuba diving. Approximately 55,000 to 60,000 people visit each year.  Most tourists travel to the Island via private concessionaries, which offer half-day or full-day trips.  Visitors may also access Buck Island by private boat, but any owner of a vessel who wishes to visit must apply for an anchoring permit.  At the time of application, boat owners receive a packet of information, including the Buck Island Reef Brochure ("the Buck Island brochure"), which provides general information about Buck Island, including natural hazards in the area.  A portion of the brochure labeled "Safety Tips for Sea and Shore" states:

> **Reef and marine hazards**:  Shallows and reefs near shore contain sharp corals, stingrays, spiny sea urchins, fire coral, fire worms, and barbed snails.  Cuts from marine organisms infect quickly, so clean and medicate them. Portuguese man-o-war and sea wasps, both stinging jellyfish, are rarely found here. Barracuda and sharks, if encountered, should be treated with caution but are not usually aggressive toward snorkelers.

The same information is posted, in both English and Spanish, on signs located at the picnic areas on the Island.

4

Barracuda is a species of fish indigenous to the Caribbean Sea and the waters around Buck Island. Although barracudas are not generally aggressive toward humans, it is believed that they may attack humans if they mistake a limb or other body appendage for prey. Prior to the attack at issue in this case, NPS officials were aware of only one other incident in the previous twenty-two years in which a barracuda had bitten a human at or around Buck Island. In that attack, which occurred sometime before 1999, a boat captain was bitten while sitting on the side of his boat with his feet dangling in the water. The NPS attributed the attack to the boat captain's pouring fish oil in the water around his feet. At the time he was bitten, there were several snorkelers in the water nearby, none of whom were attacked.

On June 16, 2006, S.R.P., through his mother, brought a tort action against the United States under the FTCA, alleging that the NPS failed to adequately warn visitors about the dangers posed by barracudas, and that the NPS failed to properly staff Buck Island.[1] On October 27, 2009, the Government moved to dismiss the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the basis that the FTCA's discretionary function exception applied. After allowing discovery on the jurisdictional question, the District Court of the Virgin Islands granted the motion to dismiss on October 1, 2010, concluding that the discretionary function exception barred S.R.P.'s claims because NPS policies gave local NPS officials

---

[1] S.R.P. does not appeal the District Court's dismissal of his negligent staffing claim.

5

discretion to craft appropriate warnings regarding potential safety hazards, and the question of whether and to what extent to warn involved significant policy considerations. *Perez v. United States*, No. 06-0080, 2010 WL 3927628 (D.V.I. Oct. 1, 2010).

S.R.P. filed a timely notice of appeal. His primary contention on appeal is that the District Court erred in concluding that the discretionary function exception barred his claims because the NPS was aware that barracudas posed a danger to swimmers, and thus had a non-discretionary duty to warn. He also argues that the District Court failed to apply the relaxed standard required for factual challenges to subject matter jurisdiction under Rule 12(b)(1), and that the District Court improperly shifted to him the burden of proving the non-applicability of the discretionary function exception.

## II. Jurisdiction and Standard of Review

S.R.P.'s complaint invoked the District Court's jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and the FTCA, 28 U.S.C. §§ 2674 and 1346(b). We have appellate jurisdiction over an appeal from a dismissal for lack of subject matter jurisdiction under 28 U.S.C. § 1291. Because the Government's motion presented a factual challenge to subject matter jurisdiction, the District Court was not confined to the allegations in S.R.P.'s complaint, and was entitled to independently evaluate the evidence to resolve disputes over jurisdictional facts. *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 n.4 (3d Cir. 2002) (*overruled on other grounds* by *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011)); *Mortensen v.*

6

*First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). We exercise plenary review over the applicability of the discretionary function exception. *Merando v. United States*, 517 F.3d 160, 163-64 (3d Cir. 2008). We review the District Court's findings of fact related to jurisdiction for clear error. *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008). We exercise plenary review in determining whether the District Court applied the correct standard in evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and whether it placed the burden of proof on the proper party. *See id.*

## III.  Discussion

### A.      The Federal Tort Claims Act Framework

The United States, "as a sovereign, is immune from suit unless it consents to be sued." *Merando*, 517 F.3d at 164 (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). The FTCA is a "partial abrogation" of that immunity, *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997), and permits suits against the United States for torts committed by "any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1). The FTCA, however, "imposes a significant limitation," *Gotha*, 115 F.3d at 179, by providing that the provisions of 28 U.S.C. § 1346 shall not apply to:

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

This discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The exception "does not apply to every situation in which there is an actual option to choose between courses of action or inaction." *Gotha*, 115 F.3d at 179. Rather, it immunizes from second-guessing "legislative and administrative decisions grounded in social, economic, and political policy." *Id.* (citing *Varig Airlines*, 467 U.S. at 814).

As a threshold matter, before determining whether the discretionary function exception applies, a court must identify the conduct at issue. *Merando*, 517 F.3d at 165. The court must then follow a two-step inquiry to determine whether the discretionary function exception immunizes the government from a suit arising out of such conduct. *Id.* at 164. "First, a

8

court must determine whether the act giving rise to the alleged injury and thus the suit involve[d] an 'element of judgment or choice.'" *Id.* (citing *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the exception does not apply because "the employee has no rightful option but to adhere to the directive." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). However, where a specific course of action is not prescribed, we proceed to the second step, which requires us to determine "whether the challenged action or inaction 'is of the kind that the discretionary function exception was designed to shield.'" *Gotha*, 115 F.3d at 179 (quoting *Berkovitz*, 486 U.S. at 536). "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . . the exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (internal marks and citations omitted). The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

Although a plaintiff bears the burden of establishing that his claims fall within the scope of the FTCA's waiver of the federal government's sovereign immunity (i.e., that the requirements of 28 U.S.C. § 1346(b)(1) are met), the

9

Government has the burden of proving the applicability of the discretionary function exception.[2] *Merando*, 517 F.3d at 164.

---

[2] We recognize that at least one of our sister circuits holds that where the Government raises the discretionary function exception, the plaintiff bears the burden to prove that the exception does not apply. *See Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998). Several other courts of appeals have declined to decide the issue. *See St. Tammany Parish v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009) (collecting cases). We acknowledge that the Supreme Court's statement in *United States v. Gaubert*, 499 U.S. 315, 324-25 (1991), that "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime" creates some uncertainty as to where the Court intended to place the burden.

**B.     The Applicability of the Discretionary Function Exception**

We turn now to S.R.P.'s contention that the District Court erred in concluding that the challenged conduct is protected by the discretionary function exception.

1.

Before engaging in the two-part discretionary function analysis, we must identify the challenged conduct. *Merando*, 517 F.3d at 165. S.R.P.'s complaint states:

---

However, absent an explicit statement from the Supreme Court that the plaintiff bears the ultimate burden, we continue to believe that the burden of proving the applicability of the discretionary function exception is most appropriately placed on the Government. Although the discretionary function exception is jurisdictional on its face, it is analogous to an affirmative defense. Therefore, just as a plaintiff cannot be expected to disprove every affirmative defense that a defendant could potentially raise, so too should a plaintiff not be expected to disprove every exception to the FTCA. Moreover, the Government will generally be in the best position to prove facts relevant to the applicability of the discretionary function exception. Our view is in accord with that of the U.S. Courts of Appeals for the Sixth, Seventh, and Ninth Circuits. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992); *Carlyle v. United States*, 674 F.2d 554, 556 (6th Cir. 1982); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952).

11

> Defendant NPS created and or maintained a dangerous condition on Buck Island in that there were no signs on the premises of Buck Island warning visitors of the existence of barracudas and/or large predatory fish on or near the premises of Buck Island. . . . At all times relevant herein, Defendant NPS knew or should have known of the dangerous conditions it created on Buck Island.

Despite the broad language of his complaint, S.R.P. does not allege that the NPS provided no warnings at all regarding the presence of barracudas in the waters surrounding Buck Island. He acknowledges that the Buck Island Reef Brochure states that "[b]arracuda and sharks, if encountered, should be treated with caution but are not usually aggressive toward snorkelers." Instead, he claims that such warnings, by their terms, apply only to snorkelers, and are therefore inadequate to advise shallow water bathers of the risk of a barracuda attack. Thus, he alleges that the NPS was negligent in failing to adequately warn visitors about the possibility of a shoreline barracuda attack.

A key dispute in this case is the extent of the NPS's knowledge regarding the dangers posed by barracudas. S.R.P. argues that the NPS was aware that barracudas might attack shoreline swimmers. The Government, however, maintains that although NPS officials were aware in the most general sense that barracudas could be dangerous to humans, they had no information to suggest that barracudas posed a

12

risk to shoreline swimmers specifically.[3]   Accordingly, the conduct at issue is the NPS's judgment regarding whether to provide warnings and the extent of any such warnings, in light of the information available.

2.

We must first determine whether a statute, regulation, or other policy required the NPS to warn of hazardous conditions in a specific manner, or whether the NPS's actions were discretionary because they involved an "element of judgment or choice."   *Gaubert*, 499 U.S. at 322.   After reviewing the applicable policies, we are convinced that NPS officials are explicitly vested with broad discretion regarding the manner in which to warn the public of dangerous conditions in national parks.

Under the NPS Organic Act, 16 U.S.C. § 1, the NPS is charged with

> promot[ing] and regulat[ing] the use of . . . national parks . . . by such means and measures as conform to the fundamental purpose of the said parks, . . . which purpose is to conserve the scenery and the natural and historic objects and

---

[3] We review the District Court's findings of fact related to jurisdiction for clear error.  *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008).  The District Court agreed with the Government's position and as we will explain later, the District Court's finding was not clearly erroneous.

the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

To implement this statutory directive, the NPS has adopted various policies and internal operating procedures, including those related to public safety and signage. The 2001 NPS Management Policies ("Management Policies" or "the Policies") provides:

> While recognizing that there are limitations on its capability to totally eliminate all hazards, the Service . . . will seek to provide a safe and healthful environment for visitors and employees. . . . The Service will strive to identify recognizable threats to the safety and health of persons and to the protection of property. . . . When practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, *signing*, or other forms of education. In doing so, the Service's preferred actions will be those that have the least impact on park resources and values.

National Park Service, 2001 Management Policies, at ¶ 8.2.5.1 (2001) (emphasis added).

14

The Management Policies thus clearly envision a system in which NPS officials will attempt to strike a balance between preservation of a park's scenery and natural resources and public safety. However, the Policies do not specifically dictate the way in which park officials should balance these concerns or the specific actions that must be taken in response to particular problems. In fact, the Policies provides:

> These management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level, who must work within the limits of funding and staffing. Examples include decisions about *whether to install warning signs* or artificial lighting; distribute weather warnings or advisories; . . . eliminate potentially dangerous animals; close roads and trails; or install guardrails and fences[.]

*Id.* (emphasis added).

These policy statements clearly vest local NPS officials with broad discretion to develop appropriate responses to natural hazards, including the posting of signs, based on a weighing of the applicable policy interests.

The NPS Sign Manual provides: "the individual park manager . . . has the responsibility for determining whether or not a sign is necessary or appropriate at a given location. The

15

decision to utilize a particular sign at a particular location requires the professional judgment of the park manager[.]" National Park Service Sign Manual, at ¶ 1-1 (Jan. 1988). In making such decisions, park officials are to "bear in mind long standing NPS policy to minimally intrude upon the natural or historic setting in National Park System areas, and to avoid an unnecessary proliferation of signs, while striving to ensure for the safety of park visitors." *Id.* The Management Policies further provides that "[s]igns will be held to the minimum number, size, and wording required to serve their intended functions." Management Policies, at ¶ 9.3.1.1. As these policies make evident, local NPS officials are afforded discretion both as to whether to post warning signs *and* as to the content of such signs. Accordingly, we hold that no statute, regulation, or policy mandated any particular method for warning about marine hazards at Buck Island.[4] The NPS's "decisions as to the precise manner in which to do so, and its execution of those decisions," *Merando*, 517 F.3d at 168, were discretionary because they involved an "element of judgment or choice," *see Gaubert*, 499 U.S. at 322.

Our conclusion is in accord with those of other courts that have addressed the issue. As the U.S. Court of Appeals for the Ninth Circuit explained in *Blackburn v. United States*, "the [NPS] policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining which

---

[4] S.R.P. has not identified any Buck Island-specific policies or regulations that would dictate a different result.

hazards require an explicit warning and in determining the precise manner in which to warn it of those hazards." 100 F.3d 1426, 1431 (9th Cir. 1996) (citations omitted). "Because the NPS cannot apprise the public of every potential danger posed by every feature of [a national park], a degree of judgment is required in order to determine which hazards require an explicit warning and which hazards speak for themselves." *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995); *see also Terbush v. United States*, 516 F.3d 1125, 1128, 1140 (9th Cir. 2008) (finding that the decision not to post warning signs regarding a recent rockfall at Yosemite National Park was discretionary); *Elder v. United States*, 312 F.3d 1172, 1176-80 (10th Cir. 2002) (concluding that the decision whether to post additional signs warning of the danger of algae in streams at Zion National Park was discretionary); *Shanksy v. United States*, 164 F.3d 688, 690, 692 (1st Cir. 1999) (holding that the NPS's decision as to whether to post warning signs at the exit of a historical building was discretionary).

3.

Having concluded that no statute, regulation, or policy mandates specific action by NPS officials with respect to warning signs on Buck Island, we must now determine whether the discretionary judgment afforded to NPS is "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Only those decisions "susceptible to policy analysis" are protected by the exception. *Gaubert*, 499 U.S. at 325. We begin by noting that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a

17

Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324. That presumption, however, can be rebutted. *Cestonaro v. United States*, 211 F.3d 749, 755 n.4 (3d Cir. 2000). In fact, we have made clear that "susceptibility analysis is not a toothless standard that the [G]overnment can satisfy merely by associating a decision with a regulatory concern." *Id.* at 755 (internal marks and citation omitted). Rather, the Government must establish that the challenged conduct is "grounded in the policy of the regulatory regime," and "based on the purposes that the . . . regime seeks to accomplish," *Gaubert*, 499 U.S. at 325 & n.7. In other words, there must be a "rational nexus" between the Government's decision and "social, economic, and political concerns." *Cestonaro*, 211 F.3d at 759.

We conclude that the NPS's decision not to post additional warning signs or add language to existing warning signs regarding the danger of a shoreline barracuda attack is susceptible to policy analysis because in determining the number, size, and content of warning signs, the NPS had to weigh the potential benefits of additional warnings against the costs of such warnings, including the risk of numbing Buck Island visitors to all warnings. Such a determination is directly related to the NPS's mission of preserving national parks while ensuring public safety and is thus firmly "grounded in the policy of the regulatory regime." *See Gaubert*, 499 U.S. at 325.

Buck Island is an offshore island in a "wild open ocean circumstance," in which virtually unlimited natural hazards are present, and the NPS must make a policy determination as

18

to which dangers are significant enough to merit specific attention on a warning sign. We have previously held that assessments of the respective degrees of risk presented by natural hazards and decisions regarding appropriate responses to such risks are susceptible to policy analysis. For example, in *Merando v. United States*, the plaintiffs challenged the manner in which the NPS located and removed hazardous trees. 517 F.3d at 162. In finding the discretionary function exception applicable, we stated that "knowing that it could not inspect every tree in the Park, the Park Service decided to expend the bulk of its resources on high-visitor use areas." *Id.* at 174. Likewise, in *Mitchell v. United States*, 225 F.3d 361, 363, 366 (3d Cir. 2000), we held that the NPS's choice not to repair or improve a drainage ditch and concrete head-wall located near a paved roadway was susceptible to policy analysis because the NPS "was forced to determine priorities among the desirable improvements" and "repair the most urgent problems first." We explained that, compared to other problems with the roadway, the defect complained of by the plaintiff presented only a "low risk of accident." *Id.* at 366.

Similarly, here, knowing that it could not warn of every potential hazard at Buck Island, the NPS decided to focus on those it reasonably believed posed the most significant threat to visitors. Moreover, too many warning signs and brochures "would inevitably reduce the impact of the individual warnings on the public," *Valdez*, 56 F.3d at 1180, as would excessive warnings on any individual sign. Once an agency identifies a hazard, it "must then balance that risk against the cost of warning about that hazard and the possibility of overloading visitors with unnecessary

warnings." *Perez*, 2010 WL 3927628, at \*12 (citations omitted). Such a judgment represents precisely the type of policy choice that the discretionary function exception prohibits us from second-guessing. Accordingly, we reject S.R.P.'s contention that once the Government decides to warn, it is no longer protected by the discretionary function exception. The exception protects both the decision whether to warn *and* decisions regarding the scope and content of such warnings. We agree with the District Court that "Congress [did not] create[] the discretionary function exception only to force the NPS into the Catch-22 of choosing between issuing no warnings at all and posting warnings about every conceivable danger, no matter how remote or hypothetical." *Id.* at \*14; *see Shanksy*, 164 F.3d at 694 (rejecting the plaintiff's argument that once the Government "decided to effectuate some modern safety measures, it became obliged to take all feasible safety measures"). Even if S.R.P. is advocating only for the incorporation of additional language regarding barracudas into existing warning signs, "such a change would necessitate a chain of further decisions," *Elder*, 312 F.3d at 1183, including whether to explain how to identify barracudas, and whether to offer detailed advice about what someone should do if he or she encounters a barracuda. Indeed, in his brief, S.R.P. argues that the Buck Island brochure should have explained in greater detail what it means to treat barracudas with "caution."[5]

---

[5] At her deposition, Zandy Hillis-Starr, the local NPS official responsible for overseeing marine research in St. Croix, testified that she understood the warning to mean "to

20

The Government draws our attention to the U.S. Court of Appeals for the Tenth Circuit's decision in *Elder v. United States*, 312 F.3d 1172 (10th Cir. 2002), which is instructive because it presents a factual scenario strikingly similar to that in our case. The suit in *Elder* arose out of a 1997 incident, in which a twelve-year-old boy died while attempting to cross a stream at the Middle Emerald Pools in Zion National Park. *Id.* at 1174. As he stepped into the stream, the boy slipped on slick algae, slid downstream, fell over a ledge, and plunged more than 100 feet onto the rocks below. *Id.* Along the trail to the Middle Emerald Pools, there were numerous signs warning visitors of various hazards and cautioning visitors to stay on the trail. *Id.* at 1174-75. No signs specifically mentioned the danger of algae in the streams. *Id.* at 1175. Nor were there any barriers preventing visitors from leaving the trail and walking into the stream. *Id.* After the accident, the plaintiffs brought suit against the United States under the FTCA, alleging that the NPS was negligent for failing to specifically warn of the algae hazard and for failing to provide adequate barriers to prevent visitors from falling over the ledge. *Id.* at 1176. In response to the Government's

not approach [a wild animal], to not threaten it, to not be aggressive toward it . . . [t]o observe it quietly, and to move away if you feel at all threatened." S.R.P. apparently wants this common sense definition included in the Buck Island brochure. Although the adequacy of the language in the brochure relates more directly to S.R.P.'s underlying negligence claim, we note that a warning brochure cannot be expected to include a definition of every term therein.

motion to dismiss based on the discretionary function exception, the plaintiffs argued that decisions regarding barriers and signs at the Middle Emerald Pools involved no policy considerations because park officials' sole consideration should have been park safety. *Id.* at 1181. The Tenth Circuit disagreed, reasoning that "park officials must weigh the cost of safety measures against the additional safety that will be achieved. Even inexpensive signs may not be worth their cost." *Id.* Additionally, "in a national park whose purpose is to preserve nature and display beauty to the public, any safety measure must be weighed against damage to natural resources and aesthetic values." *Id.*

We acknowledge that if the discretionary function exception is given an overly broad construction, it could easily swallow the FTCA's general waiver of sovereign immunity and frustrate the purpose of the statute. Accordingly, we have held that where the Government is aware of a specific risk and responding to that risk would only require the Government to take garden-variety remedial steps, the discretionary function exception does not apply. Finding that such cases are outside the scope of the discretionary function exception is consistent with the primary purpose of the FTCA. *Cestonaro*, 211 F.3d at 755. As the Supreme Court has explained, "[u]ppermost in the collective mind of Congress [when it passed the FTCA] were the ordinary common-law torts." *Dalehite v. United States*, 346 U.S. 15, 28 (1953) (*partially overruled on other grounds* by *Rayonier, Inc. v. United States*, 352 U.S. 315 (1957)). "[C]ongressional thought was centered on granting relief for the run-of-the-[mill] accidents," *id.* at 28 n.19, which

22

occurred due to the Government's failure to take basic steps to alleviate specific safety concerns. In such a situation, the Government's conduct is analogous to that of a private citizen who fails to take appropriate action to ensure the safety of visitors on his or her property, and thus no broad public policy concerns are implicated.

In arguing that the NPS's decision regarding warning signage at Buck Island was analogous to an "ordinary common law-tort[]," *id.* at 28, and thus not susceptible to policy analysis, S.R.P. relies on our decisions in *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997), and *Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000). Because the key distinctions between those cases and our case are factual, we will review them in some detail. In *Gotha*, we addressed whether the United States Navy's failure to install a handrail or lighting on a steep pathway at a Navy facility in the Virgin Islands was protected by the discretionary function exception. 115 F.3d at 178. In that case, the plaintiff fell and injured her ankle while walking on an unlit, unpaved path approximately fifteen to twenty feet in length, which dropped downward at a steep angle. *Id.* She brought suit against the Government under the FTCA, alleging that the Navy was negligent for failing to provide a stairway with handrails and for neglecting to provide sufficient lighting on the pathway. *Id.* Significantly, there was evidence that the Navy was aware of the risk because it had been asked on several previous occasions to build a stairway or install handrails. *Id.* at 180. The Government moved to dismiss under the discretionary function exception, claiming that the Navy's actions were motivated by "military, social, and economic considerations."

23

*Id.* at 181. The Government claimed that the Navy's decision was informed by the need to train in a "realistic warfare environment," as well as economic factors, such as budgetary constraints, procurement regulations, and the anticipated service life of the facility. *Id.* In rejecting the Government's argument and holding that the challenged conduct fell outside the scope of the discretionary function exception, we observed that the case was "not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that [was] about as far removed from the policies applicable to the Navy's mission as . . . possible." *Id.* We opined that "it [was] difficult to conceive of a case more likely to have been within the contemplation of Congress when it abrogated sovereign immunity than the case before us." *Id.* at 182. Accordingly, we concluded that "the challenged actions [were] not the kind of conduct that [could] be said to be grounded in the policy of the regulatory regime." *Id.* at 181-82 (quoting *Gaubert*, 499 U.S. at 325).

In *Cestonaro*, while vacationing with his family, Daniele Cestonaro was shot and killed in a parking lot in Christiansted on the island of St. Croix. 211 F.3d at 751. The parking lot fell within the boundaries of the Christiansted National Historic Site, which was owned and controlled by the National Park Service. *Id.* The plaintiff (Cestonaro's wife) brought suit under the FTCA, alleging that the NPS was negligent for failing to provide adequate lighting and warning signs in the lot. *Id.* at 752. The district court dismissed the action based on the discretionary function exception, finding that the NPS's challenged decisions were grounded in its

24

mission to "safeguard the natural and historic integrity of national parks" while "minimally intrud[ing] upon the setting of such parks." *Id.* at 752 (citation omitted). We reversed, reasoning that the NPS's decision was not related to any of the overarching policies cited by the district court. *Id.* at 756. Rather, the case involved a tort stemming from a garden variety decision not to implement safety measures, even though the NPS was aware that crimes had occurred in the lot, and had received regular complaints from local business owners about the safety of the lot. *Id.* at 751, 755. We stated that a suit based on such actions was precisely the type of case Congress contemplated when it abrogated sovereign immunity by passing the FTCA, *id.* at 755-56, and thus, we held that the Government could not "seek shelter under the discretionary function exception," *id.* at 759.

Decisions from other courts support our view that where the Government is aware of a specific risk of harm, and eliminating the danger would not implicate policy but would involve only garden-variety remedial measures, the discretionary function exception does not apply. For example, in *Boyd v. United States*, 881 F.2d 895, 896, 898 (10th Cir. 1989), the U.S. Court of Appeals for the Tenth Circuit held that the discretionary function exception did not apply where the Army Corps of Engineers created a reservoir, but failed to warn swimmers who regularly used a section of the lake that motorboats also used the area. The court reasoned that the alleged failure to warn swimmers of a dangerous condition in a popular swimming area did not implicate any social, economic, or political policy judgments. *Id.* at 898. Similarly, in *Oberson v. U.S. Dep't of Agric.*, 514

25

F.3d 989, 998 (9th Cir. 2008), the U.S. Court of Appeals for the Ninth Circuit held that where the Forest Service was aware that two snowmobiles had recently collided on a steep portion of a snowmobile track, the Forest Service's failure to post a warning or otherwise remedy the hazard was not protected by the discretionary function exception. Likewise, in *George v. United States*, 735 F. Supp. 1524, 1528, 1533 (M.D. Ala. 1990), the U.S. District Court for the Middle District of Alabama concluded that where at least six incidents of "aggressive alligator behavior" in a swimming area had been reported to various park officials, the Forest Service was on specific notice of the danger and its failure to take remedial measures was not within the ambit of the discretionary function exception. *See also Fabend v. Rosewood Hotels & Resorts, L.L.C.*, 174 F. Supp. 2d 356, 360, n.10 (D.V.I. 2001) (noting that the hazard in that case was "well-defined and specific, not a nebulous or hidden danger" and stating that "[w]here the danger is specific rather than merely potential, the discretionary function exception may not protect a government agency's failure to warn") (citations omitted).

In our case, unlike *Gotha*, *Cestonaro*, and the other cases cited above, the NPS was not aware of a specific risk.[6] Thus, S.R.P.'s reliance on those cases is misplaced. The District Court found that although the NPS was aware in a general sense that barracudas were potentially dangerous, there was no evidence that NPS officials were or should have been specifically aware of the risk of a shallow-water attack. We review this finding for clear error. *CNA*, 535 F.3d at 139. Under the clearly erroneous standard, we may not substitute our findings for those of the trial court. *Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001). Rather, we are limited to assessing whether there is enough evidence on the record to support those findings. *Id.* "That a different set of inferences could be drawn from the record is not determinative. It is sufficient that the District Court findings of fact could be reasonably inferred from the entire [] record." *Id.* (citations omitted).

The District Court explained that although NPS officials recognized that shoreline swimmers might encounter a barracuda, there was no evidence that the presence of barracudas near the shore was a danger to the public. The District Court noted that "out of hundreds of thousands of

---

[6] Although NPS decisions regarding whether and to what extent to warn the public of the dangers posed by wildlife will generally be susceptible to policy analysis, it is possible that the NPS could be aware of a safety hazard so blatant that its failure to warn the public could not reasonably be said to involve policy considerations. Therefore, we will review the extent of the NPS's knowledge in this case.

27

Buck Island visitors over the last several decades, [S.R.P.] was the first close-to-shore bather bitten by a barracuda." *Perez*, 2010 WL 3927628, at \*6. Zandy Hillis-Starr, the local NPS official in charge of overseeing marine research in St. Croix, testified in her deposition that she was unaware of any prior barracuda attack on the Buck Island shoreline. The only barracuda attack of which the NPS was aware was an attack that occurred in deeper water and involved a boat captain dumping fish oil into the water while dangling his feet over the edge of a boat.

S.R.P. argues, however, that the District Court ignored substantial evidence indicating that the NPS knew that barracudas posed a serious risk to shallow-water swimmers. First, S.R.P. notes that the Secretary of the Interior's decision to prohibit fishing in the waters surrounding Buck Island was expected to increase the barracuda population in the area, thus making an attack more likely. Second, he asserts that the Buck Island brochure's and beach signage's advisory to snorkelers to treat barracudas "with caution" indicates that NPS officials were aware that barracudas were potentially dangerous to humans. Third, he finds fault with the NPS's decision, after the attack on the boat captain, to warn concessionaires not to feed the fish or put leftover food in the water, but not to issue a similar warning to beachgoers. Finally, S.R.P. claims that NPS officials were aware that splashing in the "shallows" was a risk factor which increases the likelihood of a barracuda attack.

S.R.P.'s arguments are unpersuasive. Based on the evidence before the District Court, its finding that NPS officials were unaware of the specific risk of a shoreline

barracuda attack was not clearly erroneous. First, the fact that a boat captain in deeper water was attacked years earlier after pouring fish oil into the water does not suggest that an individual would be attacked while sitting on the beach with his feet in the water without any similar substance around him. In fact, when the boat captain was attacked, there were several snorkelers in the area, none of whom were bitten. Thus, the presence of fish oil around the boat captain's feet seems to have been a significant factor in the attack. Second, as to S.R.P.'s argument that the fishing ban should have put officials on notice that a barracuda attack was more likely, the record indicates that local NPS officials actually disagreed as to whether the fishing ban would result in an increase in the barracuda population. However, even if the ban did lead to such an increase, because barracudas were not thought to be aggressive toward swimmers, the NPS would have had no reason to anticipate an increased likelihood of attack. Third, although the Buck Island brochure advised snorkelers to treat barracudas "with caution," the same brochure stated that barracudas are not generally aggressive toward humans. Finally, S.R.P.'s claim that the NPS was aware that splashing in the shallows could lead to a barracuda attack is somewhat misleading. Although Hillis-Starr testified in her deposition that "splashing in the shallows" was a recognized risk factor for barracuda attacks, she made this statement while discussing the attack on the boat captain. She did not indicate that such behavior could lead to a barracuda attack on the shoreline. In fact, she specifically stated that it was the *combination* of pouring fish oil into the water and splashing that led to the attack. Hillis-Starr hypothesized that the barracuda likely mistook the boat captain's feet for food.

29

The key question under *Gotha* and *Cestonaro* is not whether the Government was aware of danger in the most general sense, but whether it was on notice of a specific hazard. With no shoreline barracuda attacks in the twenty-two years preceding the attack on S.R.P., the District Court did not err in finding that NPS officials had no knowledge that such an attack was likely.

Assuming, *arguendo*, that the NPS was aware of the risk, a plaintiff proceeding under the FTCA can only invoke *Gotha* and *Cestonaro* where responding to the known hazard would only require the Government to take garden-variety action, such as putting up a rail or installing additional lighting, which does not implicate any overarching policy concerns. As we explained above, the NPS's determination regarding the content of warning signs on Buck Island involved significant policy considerations. Thus, under *Gotha* and *Cestonaro*, neither condition for finding the challenged conduct outside the scope of the discretionary function exception is present in this case.

### C. Burden of Proof and Standards for Rule 12(b)(1) Motion

Although our review of the District Court's legal conclusions is plenary, *Merando*, 517 F.3d at 163-64, because our analysis – especially under *Gotha* and *Cestonaro* – relies heavily on the District Court's factual findings, which we review only for clear error, *CNA*, 535 F.3d at 139, we now address S.R.P.'s arguments that, in reaching those findings, the District Court improperly shifted the burden of proving the applicability of the discretionary function exception and

30

failed to apply a relaxed standard that we have held is required when assessing factual challenges to jurisdiction under Rule 12(b)(1).

1.

S.R.P. argues that the District Court improperly required him to prove that the discretionary function did not apply, rather than requiring the Government to prove that it did apply. *See Merando*, 517 F.3d at 164 (stating that the Government bears the burden of proving the applicability of the discretionary function exception). We disagree. The District Court correctly explained that the burden was on the Government, *Perez*, 2010 WL 3927628, at *4, and held the Government to its burden. *Cf. Gould Elecs., Inc. v. United States*, 220 F.3d 169, 179 n.8 (3d Cir. 2000) (explaining that failure to identify the governing standard suggests that the district court may not have applied that standard).

Pointing to the District Court's statement that "[p]laintiff has presented little evidence that the NPS had identified barracuda[s] as posing a serious risk to shallow water bathers[,]" *Perez*, 2010 WL 3927628, at *6, S.R.P. contends that rather than requiring the Government to establish each prong of the discretionary function exception, the District Court assessed the sufficiency of his evidence and improperly rejected his claim that the NPS was aware of a specific risk of shoreline barracuda attacks. According to S.R.P., the District Court should have first determined that the Government was mandated to act in the face of a known hazard and then required the Government to establish that it did not know of the hazard. S.R.P.'s argument glosses over a

31

critical detail. Before proceeding to the two-prong discretionary function analysis, the District Court was required to identify the conduct at issue, and in conducting this threshold inquiry, it properly looked at all of the evidence in the case. The way in which the District Court proceeded was entirely consistent with our approach in *Merando*. *See* 517 F.3d at 162-69. In that case, the plaintiff argued that the Government had negligently pruned a tree, and then failed to find and remove the hazardous tree, causing it to fall on his wife and daughter, tragically killing them. *Id.* at 162. We found that the plaintiff's allegation was unsupportable because he had "not shown that the Government was in any way involved in the [pruning] of the tree." *Id.* at 167. We thus "eliminate[d]" the plaintiff's claim that the Government negligently pruned the tree and confined our analysis to the plaintiff's challenge to the Government's alleged failure to find and remove the tree. *Id.* at 168. Similarly, the District Court here was required to distinguish between S.R.P.'s claim that the NPS was aware of a specific danger and failed to warn, and his claim that the NPS failed to identify the danger and warn accordingly. As in *Merando*, this distinction was relevant because the nature of the conduct at issue dictates the policy considerations that are implicated.

S.R.P. maintains that because the burden of proof was on the Government, he was entitled to all reasonable inferences that could be drawn from the evidence. This argument, however, conflates the placement of the burden of proof with the standard of review. The fact that the burden of proof is on the Government does not mean that a district court is required to apply a summary judgment standard and draw

32

all inferences in favor of the plaintiff. *Cf. Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009) (setting forth summary judgment standard under Federal Rule of Civil Procedure 56). In fact, we have explicitly rejected such an approach to evaluating factual challenges to jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Turicentro*, 303 F.3d at 300 n.4. The district court is the ultimate finder of fact on the jurisdictional question and is thus entitled to draw inferences in favor of the defendant if it determines that the evidence warrants such inferences. *See Merando*, 517 F.3d at 167-68 (explaining that the evidence did not allow us to draw the inference, favorable to the plaintiff, that the NPS was involved in pruning the tree). As we explained above, the evidence in this case did not warrant a finding that the NPS had identified barracudas as posing a danger to shoreline bathers.

2.

S.R.P. also argues that the District Court applied the incorrect standard in evaluating the Government's motion to dismiss. Specifically, he contends that the District Court was required, but failed, to apply a relaxed standard. We disagree; the standard S.R.P. alleges was erroneously applied is not applicable where, as here, the Government bears the burden of proof.

When a district court considers a factual challenge to subject matter jurisdiction, the court "accords the plaintiff's allegations no presumption of truth." *Turicentro*, 303 F.3d at 300 n.4 (citations omitted). "[T]he plaintiff must either prove the truth of the [necessary jurisdictional facts] or stand by

33

while the court evaluates those allegations in the same way a jury would evaluate [those facts] as part of [the] plaintiff's case on the merits." *Mortensen*, 549 F.2d at 891. "In a factual attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings." *Turicentro*, 303 F.3d at 300 n.4 (citations omitted).

As we have previously observed, in a factual attack under the FTCA, "the split between jurisdiction and the merits is not always clear." *CNA*, 535 F.3d at 141. There will frequently be overlapping issues of proof, causing the jurisdictional challenge to be "intertwined with the merits." *Id.* at 143. This case presents precisely such a situation because many of the same facts that are relevant to the question of whether the discretionary function exception applies are also relevant to the merits question of whether the NPS was negligent in developing warning signs for Buck Island. Recognizing that Rule 12(b)(1) does not provide plaintiffs the procedural safeguards of Rule 12(b)(6), such as assuming the truth of the plaintiff's allegations, we have articulated a relaxed standard of proof for the jurisdictional

34

question where jurisdiction is intertwined with the merits.[7] *See Mortensen*, 549 F.2d at 891. In such a case, a district court may determine whether jurisdiction exists without reaching the merits "so long as the court 'demands less in the way of jurisdictional proof than would be appropriate at a trial stage.'" *Gould Electronics*, 220 F.3d at 178 (quoting *Mortensen*, 549 F.2d at 891). "By requiring less of a factual showing than would be required to succeed at trial, [we] ensure that [district courts] do not prematurely grant Rule 12(b)(1) motions to dismiss claims in which jurisdiction is intertwined with the merits and could be established, along with the merits, given the benefit of discovery." *See CNA*, 535 F.3d at 145.

---

[7] We note that several of our sister circuits disagree with our approach, and require district courts to treat Rule 12(b)(1) motions to dismiss where jurisdiction is intertwined with the merits as challenges on the merits. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1530 (11th Cir. 1990) (explaining that, in such a situation, a district court is constrained by the limitations of summary judgment practice); *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case."). S.R.P.'s reliance on these cases, however, is misplaced because we take a different approach to cases where the jurisdictional question is intertwined with the merits.

35

S.R.P. argues that in concluding that the Government had not identified barracudas as posing a risk to shallow water bathers, the District Court failed to apply this relaxed standard.[8]  We have never directly addressed the role of this standard where, as here, the burden of proving the relevant jurisdictional facts is on the defendant.  However, there is clearly a logical tension between the two rules.  Because the plaintiff does not have to prove any facts related to the applicability of the discretionary function exception, there is nothing, at least in terms of facts that the plaintiff is required to prove, to which to apply a relaxed standard of proof.  And applying that standard to the defendant, and thus allowing the defendant to defeat jurisdiction more easily, would be inconsistent with the policy underlying our creation of the relaxed standard in the first place.  *See CNA*, 535 F.3d at 145.  Accordingly, because the Government bears the burden of proving the discretionary function exception, the "less in the way of jurisdictional proof" standard does not apply.

Although we have applied that standard to other cases brought under the FTCA, those cases are distinguishable because they involved threshold requirements under 28 U.S.C. § 1346(b)(1), for which the plaintiff bears the burden

---

[8] It is worth noting that although we hold that the "less in the way of jurisdictional proof" standard does not apply here because the Government bears the burden of proof, the District Court specifically identified the relaxed standard and purported to apply it.  Thus, assuming, *arguendo*, that the relaxed standard did apply, S.R.P.'s position would be difficult to sustain.

of proof. For example, in *CNA v. United States*, we applied the relaxed standard to the question of whether a federal employee was acting within the scope of his employment, as required under § 1346(b)(1). 535 F.3d at 145-46. Similarly, in *Gould Electronics v. United States*, we applied the relaxed standard to the question of which state's substantive law controlled the underlying tort action.[9] 220 F.3d at 178. Here, in contrast to *CNA* and *Gould*, the Government bears the burden of proving the necessary jurisdictional facts. Accordingly, because the relaxed standard of proof did not apply to the question before the District Court, S.R.P.'s contention that the District Court failed to apply that standard is inapposite.

---

[9] In *Gould Electronics v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), we stated that "we s[aw] no principled reason to distinguish between a jurisdictional determination based on the discretionary function exception and one based on a conflict of laws analysis." We do not see this language as a barrier to our conclusion today. In *Gould*, we were referring to the fact that there was no reason to treat a conflict of law inquiry under the FTCA as non-jurisdictional where other issues under the FTCA, including the applicability of the discretionary function exception, are jurisdictional in nature. Nowhere did we state that the "less in the way of jurisdictional proof" standard applies to discretionary function exception cases.

## IV. Conclusion

For the foregoing reasons, we will affirm the order of the District Court granting the Government's motion to dismiss for lack of subject matter jurisdiction.

**ROTH**, Circuit Judge, Concurring:

     I join the majority in affirming the District Court's dismissal of the claims in this case.  I write separately, however, because of my concern that the majority's opinion will eviscerate the discretionary function exception by inserting an improper element into the analysis of whether sovereign immunity has been waived under the FTCA.  In my view, (1) the NPS's knowledge of the risk of barracuda attacks and (2) our determination of whether the remedial steps necessary to warn of that risk are "garden-variety" are both irrelevant to the question of whether the discretionary function exception protects the NPS from claims based on the content, configuration, location or number of warning signs displayed at Buck Island Reef National Monument.  If the discretionary function exception applies in a situation in which consideration of public policy governs a choice of action by a government agency, the "garden-variety" of the remedy should not remove the shield of sovereign immunity. I fear that the holding of the majority would do just that.

     I agree with a great deal of what the majority has stated.  First, the discretionary function exception shields the government only from those claims which challenge actions that (1) "involve an element of judgment or choice" and that (2) are "based on consideration of public policy."  *United States v. Gaubert*, 499 U.S. 315, 322, 323 (1991).  I also agree that whether an action involves an element of judgment

or choice depends entirely on whether "a federal statute, regulation, or policy specifically prescribes a course of action . . .." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). If an action is specifically prescribed, there is no discretion as to how to perform it. Finally, I agree that, if there is no precise statutory, regulatory, or policy prescription for a course of action, the determination whether an action is based on public policy considerations focuses on the "nature of the action[] taken" and whether it is "susceptible to policy analysis. *Gaubert*, 499 U.S. at 315.

In this case, involving the National Park Service, an examination of the applicable statutes, regulations and policies reveals no specific prescription for how the NPS should configure warning signs. To the contrary, NPS policies direct that the NPS must exercise discretion in deciding why, where, how and when to put up such signs. The NPS Management Policies and the NPS Sign Manual vest the NPS with the discretion to strike a balance between economics, aesthetics and risk in determining the appropriate response to hazards in the national parks. This discretion to decide if and how risks will be warned of includes:

> 1. The consideration of what measures will have the least impact on park resources and values. 2001 Management Policies, ¶ 8.2.5.1.

> 2. The determination of whether to install warning signs. *Id.*

2

3. The allocation to the individual park manager of the decision that a sign is necessary or appropriate for any given location. Sign Manual, ¶ 1-1.

4. The limitation of signs to the minimum number, size and wording required to service their intended function. 2001 Management Policies, ¶ 9.3.1.1.

Clearly, as provided for in NPS policies, signage in the National Parks is based on judgment and choice. The selection and location of signage is, therefore, protected by the discretionary function exception. As stated by the Ninth Circuit Court of Appeals, "the [NPS] policy manuals' broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards, in determining the precise manner in which to warn it of those hazards." *Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (citations omitted).

In light of this discretion, the extent of the NPS's knowledge of a safety hazard is not relevant to the consideration of whether the discretionary function exception bars a suit challenging the NPS's response to that hazard. The NPS explicitly has the discretion to set up a system to identify threats and to determine the proper warning, if any, that should be given to the public of an identified threat. The discretion to warn of a risk encompasses the discretion not to warn. Indeed, the discretion to decide how to define risks protects against the possibility of not uncovering a risk. For

3

instance, in *Merando v. United States*, 517 F.3d 160 (3d Cir. 2008), where we found the discretionary function exception protected the NPS in the system it chose to determine what trees in the park might pose a danger to visitors, we concluded that it made "no legal distinction" whether the NPS was actually aware of the particular hazardous tree which fell. In either case, sovereign immunity was not waived. *Id.* at 174.

Furthermore, even if the NPS were to be negligent in its evaluation of the risks that should be warned of, because the decision to warn is an exercise of discretion, the discretionary function exception applies whether or not the discretion has been appropriately exercised. The sovereign immunity waiver of the FTCA specifically states that the exception applies "*whether or not the discretion involved be abused.*" 28 U.S.C. § 2680(a) (emphasis added).

Under the majority's theory of this case, however, if the government has knowledge of a safety hazard, then its response to that hazard is protected by the discretionary function exception *only if* addressing the hazard does not require "garden-variety action." The majority concluded that the decision whether and how to further warn of barracuda attacks at Buck Island could potentially be based on a weighing of "the potential benefits of additional warnings against the costs of such warnings, including the risk of numbing Buck Island visitors to all warnings. Such a determination is directly related to the NPS's mission of preserving national parks while ensuring public safety and is thus firmly grounded in the policy of the regulatory regime." *Ante* ___ [typescript at 16].

4

The majority goes on, however, to limit this holding by stating that "where the Government is aware of a specific risk and responding to that risk would only require the Government to take *garden-variety* remedial steps, the discretionary function exception does not apply." *Ante* ___. [typescript at 19] (emphasis added).

It is this "garden-variety" language which has prompted my concurrence. If the determination of the hazard is protected by the discretionary function exception but the risk of liability depends on whether the remedial steps to correct or warn of this risk are "garden-variety," or not, haven't we eviscerated the exception? Haven't we protected policy choices which require expensive, extensive, or complicated remedies, but left the NPS open to liability if the remedy is simple or inexpensive? Indeed, how do you differentiate a "garden-variety" warning sign from a sign that is not "garden-variety?"

This "garden-variety" language comes from our opinions in *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997) and *Cestonaro v. United States*, 211 F.3d 749 (3d Cir. 2000). The majority claims that this "garden-variety" analysis is necessary because of our holding in these two cases. I do not interpret anything in either of those opinions to establish such a qualification to the discretionary function exception. *Gotha* involved the question of lightning and a railing on a steep pathway in a U.S. Navy Base. We held that the discretionary function exception did not apply because the case was "not about a national security concern, but rather a mundane, administrative, *garden-variety*, housekeeping problem that [was] about as far removed from the *policies* applicable to the Navy's mission as . . . possible." *Gotha*, 115

5

F.3d at 181 (emphasis added). There was no showing of any U.S. Navy policy directives concerned with this issue. Here, on the contrary, we do have NPS policy directives on point.

In *Cestonaro*, we evaluated whether the discretionary function exception barred claims challenging the NPS's response to safety risks in an area on the edge of an NPS park that was unofficially used as a parking lot for other places of business. Plaintiff and his decedent had parked there to go to a restaurant, not to visit the park. We stated that "[t]he National Park Service's knowledge, or lack thereof, of the dangers in the Hospital Street lot relate more directly to the underlying negligence claims than to whether the challenged actions . . . were protected by the discretionary function exception." 211 F.3d at 751 n.1. I can only presume that in coming to this conclusion, we did not equate risks of crime in an unofficial parking area with the discretion necessary for the NPS to determine what hazards within the parks should warned of, where the warning should be placed, and how the warning should be stated – discretionary matters spelled out in NPS policy.

Therefore, for the reasons stated above, I would hold that the NPS's knowledge of a safety hazard is irrelevant to the issue of whether the discretionary function exception bars claims challenging NPS's response to that hazard. I would also hold that whether the measure taken to warn of that hazard can be described as a "garden-variety" measure is irrelevant. In my view, the applicability of the discretionary function exception is contingent only upon (1) whether a federal statute, regulation, or policy prescribes a specific response and (2) if not, whether the choice of the response is affected by social, economic, or political considerations. The

nature of the proposed remedy -- "garden-variety" or otherwise – does not matter. Because I agree that no statute, regulation, or policy explicitly requires the NPS to respond to the risk of barracuda attacks in a specific way and that the policies of the NPS require discretion in identifying and warning of hazards, I would apply the discretionary function exception here to bar waiver of sovereign immunity – without the "garden-variety" condition imposed by the majority.